540

SOUTH TEXAS RICE WAREHOUSE COMPANY, PETITIONER,[1] v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

J. E. DAVANT AND KATHRYN DAVANT, PETITIONERS,[2] v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1048-63, 1114-63—1123-63, 2460-63, 5611-63. Filed January 29, 1965.

[1] This case was not consolidated for trial with J. E. Davant and Kathryn Davant, docket No. 1114-63, and the other cases which were consolidated with that case, but by agreement of the parties the testimony taken in this case was stipulated into the record of J. E. Davant and Kathryn Davant and the other cases consolidated therewith. For the purpose of avoiding repetition of findings of fact, the cases are being consolidated for findings of fact and opinion.

[2] Proceedings of the following petitioners are consolidated herewith: Hortense E. Davant, docket No. 1115-63; T. E. Dunnam and Mary Anne D. Dunnam, docket No. 1116-63; Estate of L. D. Clements, Deceased, Ruth Neal Clements, Executrix, and Mrs. L. D. Clements, Individually, docket No. 1117-63; William S. Fly and Betty Clements Fly, docket No. 1118-63; S. M. Clements and Mrs. S. M. Clements, docket No. 1119-63; Edward W. Clark and Marienne Clements Clark, docket No. 1120-63; Raye W. Pegram, docket No. 1121-63; R. Q. Pegram and Mrs. R. Q. (Denny) Pegram, docket No. 1122-63; Scranton B. Jones and Joyce Pegram Jones, docket No. 1123-63; Jack R. Dodson and Kathryn D. Dodson, docket No. 2460-63; and William G. Elliott and Peggy Pegram Elliott, docket No. 5611-63.

*Homer L. Bruce, Robert J. Piro,* and *William C. Griffith,* for the petitioners.

*Harold Friedman,* for the respondent.

Scott, *Judge:* Respondent determined deficiencies in the income tax liability of petitioner South Texas Rice Warehouse Co. for the years and in the amounts as follows:

| Year ended June 30— | Deficiency |
|---|---|
| 1955 | $8,590.87 |
| 1956 | 17,956.96 |
| 1957 | 6,442.44 |
| 1958 | 32,903.25 |
| 1959 | 26,711.24 |
| 1960 | 34,455.51 |
| Total | 127,060.27 |

The deficiencies determined for the taxable years ended June 30, 1955, 1956, and 1957, resulted from the disallowance of net operating losses, previously allowed as carrybacks from the taxable years ended June 30, 1958, 1959, and 1960.

Respondent determined deficiencies in the income taxes of the remaining petitioners for the calendar year 1960 and additional deficiencies in amendments to answer filed at the trial in the amounts as follows:

| Docket No. | Petitioners | Deficiency determined in statutory notice | Additional deficiency alleged in amendments to answer |
|---|---|---|---|
| 1114–63 | J. E. Davant and Kathryn Davant | $24,827.49 | $1,484.17 |
| 1115–63 | Hortense E. Davant | 10,969.99 | 827.25 |
| 1116–63 | T. E. Dunnam and Mary Anne D. Dunnam | 22,287.97 | 1,484.17 |
| 1117–63 | Estate of L. D. Clements, Deceased, Ruth Neal Clements, Executrix, and Mrs. L. D. Clements, Individually | 103,017.35 | 4,343.03 |
| 1118–63 | William S. Fly and Betty Clements Fly | 9,338.47 | 987.84 |
| 1119–63 | S. M. Clements and Mrs. S. M. Clements | 68,063.14 | 3,542.55 |
| 1120–63 | Edward W. Clark and Marienne Clements Clark | 47,354.85 | 3,082.77 |
| 1121–63 | Raye W. Pegram | 39,358.12 | 1,413.62 |
| 1122–63 | R. Q. Pegram and Mrs. R. Q. (Denny) Pegram | 34,193.31 | 1,209.24 |
| 1123–63 | Scranton B. Jones and Joyce Pegram Jones | 8,499.44 | 936.74 |
| 2460–63 | Jack R. Dodson and Kathryn D. Dodson | 24,667.39 | 1,581.49 |
| 5611–63 | William G. Elliott and Peggy Pegram Elliott | 9,099.36 | 936.83 |

The issues for decision in the case of petitioner South Texas Rice Warehouse Co. are:

(1) Whether the gross income and deductions reflected on the partnership records of South Texas Rice Enterprises for the period June 30 to December 31, 1957, and the years 1958 and 1959 were actually earned by or attributable to petitioner South Texas Rice Warehouse Co.

(2) In the alternative, if it is held that the income and deductions of South Texas Rice Enterprises were not actually earned by or attributable to South Texas Rice Warehouse Co., whether under the provisions of section 482 of the Internal Revenue Code of 1954, respondent properly allocated $30,000 of the income of South Texas Rice Enterprises to South Texas Rice Warehouse Co. as additional rent for each of its fiscal years ended June 30, 1958, 1959, and 1960.

The affirmative issue raised by the amendments to answer filed at the trial in the case of petitioners J. E. Davant and Kathyrn Davant and the cases consolidated therewith has been settled by the parties, leaving for our decision in these consolidated cases the following:

(1) Whether the substance of the transaction between petitioners and a person who at the time of the transaction owned no stock in South Texas Rice Warehouse Co. constituted a sale by petitioners of their stock in South Texas Rice Warehouse Co.

(2) If the transaction whereby petitioners transferred their stock in South Texas Rice Warehouse Co. to an individual who immediately, as sole stockholder, passed a resolution to liquidate the corporation is not in substance a sale, (a) did the transfer by South Texas Rice Warehouse Co. of all of its assets to South Texas Water Co. constitute a sale of assets after adoption of a plan for liquidation with a distribution of all assets of the liquidated corporation within a period of 1 year to the stockholders of the liquidating corporation so that the distribution should be considered the equivalent of a sale of stock by the stockholders under the provisions of section 337 of the Internal Revenue Code of 1954; [3] or (b) did the transaction constitute a reorganization within the provisions of either section 368(a)(1)(F) or 368(a)(1)(D)?

(3) If the transaction whereby South Texas Rice Co. transferred its assets to South Texas Water Co. constituted a reorganization within the provisions of either section 368(a)(1)(F) or 368(a)(1)(D), is the total amount received by the stockholders taxable to them as a dividend under section 301, or is the amount taxable as a dividend limited to the available earnings and profits of South Texas Rice Warehouse Co. without regard to the amount of earnings and profits of South Texas Water Co.?

---

[3] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

(4) In the alternative, was the sales price of its assets by South Texas Rice Warehouse Co. to South Texas Water Co. in excess of the fair market value of the assets transferred so as to cause the excessive amount to constitute a dividend under section 301 to the shareholders of South Texas Water Co. paid to them through South Texas Rice Warehouse Co. or the individual to whom the stock of the latter company was transferred?

## FINDINGS OF FACT

### General Facts

Some of the facts have been stipulated and are found accordingly.

South Texas Rice Warehouse Co. (hereinafter referred to as Warehouse) was incorporated under the laws of the State of Texas in July 1936. At all times relevant to these cases, it kept its books and records and reported its income on the basis of a fiscal year ending June 30. Warehouse filed U.S. corporation income tax returns for each of its fiscal years ended June 30, 1955, 1956, 1957, 1958, 1959, and 1960, with the district director of internal revenue at Austin, Tex.

The petitioners in J. E. Davant and Kathyrn Davant and the cases consolidated therewith are individuals with residences as shown hereinafter, who filed individual or joint Federal income tax returns with the district director of internal revenue as indicated hereinafter:

| Docket No. | Petitioners | Residence | District in which return was filed |
|---|---|---|---|
| 1114-63 | J. E. Davant and Kathyrn Davant | Port Lavaca, Tex | Austin, Tex. |
| 1115-63 | Hortense E. Davant | Corsicana, Tex | Dallas, Tex. |
| 1116-63 | T. E. Dunnam and Mary Anne D. Dunnam | Port Lavaca, Tex | Austin, Tex. |
| 1117-63 | Estate of L. D. Clements,[1] Deceased, Ruth Neal Clements, Executrix, and Mrs. L. D. Clements, Individually. | Wharton, Tex | Do. |
| 1118-63 | William S. Fly and Betty Clements Fly | Victoria, Tex | Do. |
| 1119-63 | S. M. Clements and Mrs. S. M. Clements | Houston, Tex | Do. |
| 1120-63 | Edward W. Clark and Marienne Clements Clark | do | Do. |
| 1121-63 | Raye W. Pegram | Austin, Tex | Do. |
| 1122-63 | R. Q. Pegram and Mrs. R. Q. (Denny) Pegram | Bellaire, Tex | Do. |
| 1123-63 | Scranton B. Jones and Joyce Pegram Jones | Fort Worth, Tex | Dallas, Tex. |
| 2460-63 | Jack R. Dodson and Kathryn D. Dodson | Hillhouse, Miss | Jackson, Miss. |
| 5611-63 | William G. Elliott and Peggy Pegram Elliott | Lexington, Mass | Boston, Mass. |

[1] L. D. Clements died subsequent to the filing of the petition in this case and on Nov. 18, 1963, Ruth Neal Clements was appointed executrix of his estate.

The principal business of Warehouse prior to June 30, 1957, consisted of drying, cleaning, and warehousing of rice. Much of the rice which was handled by Warehouse came from lands which were owned by South Texas Water Co. (hereinafter referred to as Water Co.) a Texas corporation organized in 1934, which lands were rented by Water Co. to South Texas Rice Farms, a partnership. The principal business of Water Co. was the ownership and operation of a canal

system used in the irrigation of ricelands and the leasing of land which it owned to the partnership South Texas Rice Farms (hereinafter referred to as Rice Farms). The principal business of Rice Farms was leasing land from Water Co. and re-leasing the land to tenant farmers on a sharecrop arrangement, the arrangement generally being an equal split of the rice crop harvested between the tenant and Rice Farms.

At all times relevant to this case Warehouse and Water Co. were each owned in equal proportion by four families, the percentage of the stock ownership of the various family members in each company being as follows with the respective families shown by indentation after the first name of the members of the family:

| Owner of stock | Percent of ownership |
|---|---|
| L. D. Clements | 20 |
|     Thurman S. Clements | $2\frac{1}{2}$ |
|     Betty Dickson Clements Fly and William S. Fly | $2\frac{1}{2}$ |
| John E. Davant | $7\frac{6}{7}$ |
|     Kathryn Davant Dodson | $7\frac{1}{7}$ |
|     Mary Anne Davant Dunnam | $7\frac{1}{7}$ |
|     Hortense E. Davant | $2\frac{6}{7}$ |
| S. M. Clements | 15 |
|     Marienne Clements Clark and E. W. Clark | 10 |
| Raye W. Pegram | 8 |
|     R. Q. Pegram, Jr | 8 |
|     Joyce Pegram Jones | 3 |
|     Peggy Pegram Elliott | 3 |
|     Ray Beth Foster | 3 |

The persons shown by indenting in the foregoing tabulation were children of the first-named person in the family except that J. E. Davant was the brother of Kathryn Davant Dodson and Mary Anne Davant Dunnam and the nephew of Hortense E. Davant.

Water Co. in all years relevant to this case kept its books and records and reported its income on the basis of a fiscal year ending April 30.

The partners in Rice Farms were the same persons who were the stockholders of Warehouse and Water Co. and their respective interests were in substantially the same proportions as their stock ownership in the corporations.

The riceland which was leased to Rice Farms was irrigated by Water Co. and the rice of Rice Farms was put through Warehouse's dryer; and when stored, it was stored in the storage facilities of Warehouse. Generally, the cotenants of Rice Farms would put their rice through Warehouse's dryer and store their rice with Warehouse.

The main offices of Warehouse, Water Co., and Rice Farms were located in Rosharon, Tex., and the books and records of these companies were kept in the same office.

The original warehouses of Warehouse were of the flat type and were built around 1936. At that time rice was commonly stored in sacks and was not artificially dried. During the early 1940's certain warehouses began to build sack dryers and in the latter part of the 1940's began to build bulk dryers and storage facilities.

Around 1948 or 1949 Warehouse built a rice dryer and bulk storage facility at Rosharon, Tex. In 1951 an additional bulk storage building and additional bulk storage machinery were added to the facilities of Warehouse. The following schedule lists the various properties and equipment owned by Warehouse at June 30, 1955, showing the original cost, annual depreciation rate, accumulated reserve for depreciation as of June 30, 1955, and remaining undepreciated costs:

| Asset group | Original cost | Annual depreciation rate | Accumulated reserve for depreciation | Remaining undepreciated cost |
|---|---|---|---|---|
| Land: | | *Percent* | | |
| Rosharon | $2,737.60 | | | $2,737.60 |
| Liverpool | 500.00 | | | 500.00 |
| | 3,237.60 | | | 3,237.60 |
| Warehouses: | | | | |
| Rosharon | 27,672.08 | 5 | $26,095.98 | 1,576.10 |
| Rosharon—small | 750.00 | 5 | 551.13 | 198.87 |
| Danbury | 19,644.24 | 5 | 18,655.44 | 988.80 |
| Warehouse bins—Rosharon | 2,643.84 | 10 | 1,718.47 | 925.37 |
| Bulk storage building | 45,298.05 | 5 | 8,682.12 | 36,615.93 |
| Tenant dwelling—Rosharon | 311.36 | 5 | 293.56 | 17.80 |
| | 96,319.57 | | 55,996.70 | 40,322.87 |
| Rice dryer buildings and equipment—Rosharon: | | | | |
| Buildings (including bins) | 109,364.66 | 5 | 37,603.87 | 71,760.79 |
| Machinery and equipment | 207,732.77 | 10 | 140,081.96 | 67,650.81 |
| Bulk storage machinery | 10,849.46 | 10 | 4,129.00 | 6,720.46 |
| | 327,946.89 | | 181,814.83 | 146,132.06 |
| Other machinery and equipment: | | | | |
| Elevator and sacking equipment | 3,904.29 | 10 | 2,686.48 | 1,217.81 |
| Cleaning equipment | 4,160.43 | 10 | 3,130.28 | 1,030.15 |
| Furniture and equipment | 9,948.38 | 10 | 7,125.07 | 2,823.31 |
| Automotive equipment | 3,938.48 | 33⅓ | 1,281.41 | 2,657.07 |
| | 21,951.58 | | 14,223.24 | 7,728.34 |
| Construction work in progress—sprinkler system | 45,733.50 | | | 45,733.50 |
| | 495,189.14 | | 252,034.77 | 243,154.37 |

As shown by the aforegoing schedule, Warehouse at June 30, 1955, was in the process of installing a sprinkler system. The construction of this system was completed during its fiscal year ended June 30, 1956.

On March 6, 1956, at a special meeting of the board of directors of Warehouse, construction of an additional 65,000-barrel bulk storage facility at Rosharon at an approximate cost of $165,000 was approved. Subsequent to this date and during its fiscal year ended June 30, 1957, Warehouse completed this bulk storage plant at a cost of $165,784.48. The following schedule shows a summary of Warehouse's plant, prop-

erty, and equipment at original cost as of June 30, 1958, June 30, 1959, and June 30, 1960:

|  | 1958 | 1959 | 1960 |
|---|---|---|---|
| Land | $3, 737. 60 | $3, 737. 60 | $3, 737. 60 |
| Warehouses [1] | 285, 152. 05 | 285, 152. 05 | 285, 152. 05 |
| Dryer buildings | 116, 861. 48 | 127, 535. 47 | 127, 535. 47 |
| Dryer machinery and equipment | 207, 917. 77 | 221, 180. 32 | 221, 524. 78 |
| Bulk storage machinery | 19, 736. 03 | 19, 736. 03 | 19, 736. 03 |
| Other machinery and equipment | 54, 935. 06 | 56, 757. 82 | 56, 557. 82 |
| Total | 688, 339. 99 | 714, 099. 29 | 714, 243. 75 |

[1] Includes $165,784.48 grain storage facility labeled as "Silo building and machinery."

In its fiscal year ended June 30, 1958, the only addition made to Warehouse's plant was of cleaning equipment at a cost of $4,604.19 and an addition to a tenant dwelling in Rosharon, Tex., in the amount of $98.94. The additions made by Warehouse in its fiscal year ended June 30, 1959, to its plant, property, and equipment consisted of the following items totaling $28,456.36 with the estimated useful life indicated:

| Addition | Cost | Estimated life in years |
|---|---|---|
| Automotive equipment | $4, 519. 82 | 3 |
| Buildings (including bins) | 10, 673. 99 | 10 and 20 |
| Machinery and equipment | 13, 262. 55 | 10 |

In its fiscal year ended June 30, 1960, the additions made by Warehouse consisted of machinery and equipment, depreciated on the basis of a useful life of 10 years, in the amount of $344.16.

*Facts With Respect to the Tax Deficiencies of Warehouse*

During June 1957 a partnership was organized under the name of South Texas Rice Enterprises (hereinafter referred to as Enterprises). The following schedule shows the persons holding interest in this partnership and their percentage interest as of June 30, 1957, 1958, 1959, and 1960:

| | | Percent interest in partnership years ended June 30— | |
|---|---|---|---|
| Partner | | 1957 | 1958, 1959, and 1960 |
| Thurman S. Clements | | 12½ | 12½ |
| Betty Dickson Clements Fly and William S. Fly | | 12½ | 12½ |
| John E. Davant | | 10⅝ | 7⅞ |
| Kathryn Davant Dodson | | 7⅟₇ | 7⅟₇ |
| Mary Anne Davant Dunnam | | 7⅟₇ | 7⅟₇ |
| Hortense E. Davant [1] | | 0 | 2⅝⁄₇ |
| Marienne Clements Clark and E. W. Clark | | 25 | 25 |
| Raye W. Pegram | | 5 | 5 |
| R. Q. Pegram, Jr | | 5 | 5 |
| Joyce Pegram Jones | | 5 | 5 |
| Peggy Pegram Elliott | | 5 | 5 |
| Ray Beth Foster | | 5 | 5 |

[1] Hortense E. Davant did not execute the original partnership agreement, but her percentage interest was taken by or in the name of John E. Davant, her nephew, and was assigned to her in 1958.

S. M. Clements and L. D. Clements, who held stock ownership in Warehouse but did not hold an interest in the partnership, Enterprises, are brothers.

The managing partners borrowed $15,000 or $20,000 to put into the partnership initially but aside from these borrowed funds, the partners made no initial capital investment in the partnership.

On July 1, 1957, Warehouse, by E. W. Clark, president, and Enterprises, by E. W. Clark, member of the firm, signed a document which recited that it was an agreement between Warehouse, referred to as lessor, and Enterprises, referred to as lessee. This agreement recited that the lessor leased unto the lessee for a term beginning on July 1, 1957, and terminating on June 30, 1958, all of the real estate, equipment, and personal property owned by the lessor except cash on hand or in the bank, accounts receivable, and its corporate records, for which the lessee agreed to pay a monthly rental of $4,000. This document provided, among other things, that the lessee should have the right to make additions or alterations or changes in the buildings, that in the event of damage to the property by reason of negligence of the lessee or its agents, lessee should pay for repairs, and that during the term of the lease the lessee should carry insurance on the leased premises. The lease provided that at the termination of the 1-year term of the lease, the lessee should have the option to have the lease extended and continued for an additional period of 1 year; and at the termination of the first extension, the lessee should have the option of continuing it for an additional 1-year period, expiring on June 30, 1960. The agreement further provided that the lease might be assigned in whole or in part or that any part of the premises might be sublet without consent of the lessor.

In May of 1957, prior to the formation of Enterprises, R. Q. Pegram, Jr., E. W. Clark, Thurman S. Clements, and John E. Davant called upon the attorney who had been representing Warehouse and Water Co. and other interests of the Clements and Davant families for many years to inquire about the possibility of forming a partnership, and the partnership's leasing the properties of Warehouse. This attorney informed the four prospective partners who called upon him that such a partnership could be formed and could lease Warehouse's facilities but that the partnership would have to pay a reasonable rent. The prospective partners then arranged to have this attorney draw up a partnership agreement. The partnership agreement which was drawn up, setting forth the partnership interests in the amounts we have heretofore set forth, was signed by each of the partners on or about June 1, 1957.

Subsequent to the signing of this partnership agreement, John E. Davant, Thurman S. Clements, E. W. Clark, and R. Q. Pegram, Jr., met in this same attorney's office with L. D. Clements and S. M. Clements to discuss the rental to be fixed for Warehouse's facilities. The four representatives of the partnership made an offer of $3,000 a month rent, and L. D. Clements and S. M. Clements suggested $50,000 a year as rental. At the conclusion of this meeting in the attorney's office it had been decided that the amount of the rental would be $4,000 a month, to which all parties present agreed.

For some time prior to July 1, 1957, E. W. Clark had been president of Warehouse and manager of the business operated by Warehouse. At the time discussions with respect to formation of the partnership were under way, S. M. Clements told his son-in-law, E. W. Clark, that if he wanted a full 25 percent in the partnership, he could have it.

Both S. M. Clements and L. D. Clements had for a number of years prior to July 1, 1957, been inactive in the management of the various family businesses. They wanted to allow a greater ownership in the business operations to their children who were the ones actually working in the management of the business without increasing their personal liability or permanently disposing of their equitable interest in the physical assets owned by the various family businesses. E. W. Clark as a member of the partnership managed the rice drying and warehousing businesses after July 1, 1957, using substantially the same employees as he had used as manager for Warehouse prior to the lease of the properties to the partnership. The offices of Enterprises were established in the same location with those of Warehouse, Water Co., and Rice Farms. A completely separate set of books was kept for Enterprises' operations. R. Q. Pegram, Jr., had for some years managed, and throughout the years here in issue continued to manage, the operations of Water Co. If E. W. Clark was absent from the office, R. Q. Pegram, Jr., would at times act on behalf of Enterprises in signing warehousing contracts and performing similar functions.

The net profits of Warehouse for its fiscal years ended June 30, 1955, 1956, and 1957, as reported on its income tax returns were $130,710.77, $161,021.42, and $75,594.29, respectively. For each of its fiscal years ended June 30, 1958, 1959, and 1960, Warehouse reported losses on its Federal income tax returns. The following schedule shows the income and deductions shown by Warehouse on these income tax returns in arriving at the reported losses.

| | Fiscal years ended June 30— | | |
| | 1958 | 1959 | 1960 |
|---|---|---|---|
| Total income | $48,004.73 | $49,583.18 | $51,199.39 |
| Bad debts | | | |
| Repairs | | 45.00 | 55.00 |
| Rents | | 36.00 | 36.00 |
| Taxes | 5,635.51 | 5,538.82 | 6,659.52 |
| Amortization | 33,156.89 | 33,156.89 | 33,156.89 |
| Depreciation | 38,893.42 | 25,108.32 | 20,183.74 |
| Other deductions [1] | 3,360.73 | 3,590.27 | 3,367.09 |
| Interest | | 119.56 | 130.45 |
| Total deductions | 81,046.55 | 67,594.86 | 63,588.69 |
| Excess of deductions over income | (33,041.82) | (18,011.68) | (12,389.30) |

[1] Legal expenses and insurance.

Gross receipts reported by Enterprises for its first 6 months (the period July 1, 1957, to December 31, 1957) amounted to $219,577.96. Enterprises showed a net profit of $127,400.12 for this period after payment of $4,500 to E. W. Clark as managing partner which was approximately the same amount which had previously been paid to E. W. Clark as manager of the drying and warehousing operations for Warehouse. The expenses shown by Enterprises for this period consisted of the following:

| Expense | | Amount |
|---|---|---|
| Salaries | | $32,226.16 |
| Payments to partners | | 4,500.00 |
| Rent | | 24,000.00 |
| Interest | | 225.00 |
| Taxes | | 840.59 |
| Repairs | | 1,468.75 |
| Other deductions: | | |
| Heat, lights, water, and power | $3,667.53 | |
| Dryer fuel | 4,316.40 | |
| Legal and professional | 252.00 | |
| Miscellaneous | 173.22 | |
| Office supplies | 311.62 | |
| Telephone | 407.59 | |
| Auto and truck expenses | 1,307.47 | |
| Fumigating expense | 240.00 | |
| Freight and demurrage | 119.48 | |
| Insurance | 4,320.23 | |
| Grading certificates | 22.50 | |
| Bag and twine costs | 2,721.67 | |
| Bag conditioning | 49.14 | |
| Transportation | 400.00 | |
| Commission expense | 10,595.98 | |
| Overs and unders | 12.51 | |
| | | 28,917.34 |
| Total expenses | | 92,177.84 |

Enterprises reported net profits from operations for its calendar years 1958 and 1959 in the amounts of $75,967.89 and $109,978.13, respectively. The beginning balance sheet of Enterprises showed under assets "None" and under liabilities "None." Other than its lease of assets from Warehouse, Enterprises at no time in any of the years here involved had any operating or income-producing properties. The officers of Water Co. were authorized by the directors and stockholders of that company to make a guarantee of loans for Enterprises if such a guarantee were required by a bank.

On or about June 13, 1960, Warehouse and Enterprises, as lessor and lessee, executed another agreement similar to the agreement executed on July 1, 1957, except that the amount designated as rental in the new agreement was $4,166.66 per month. The new agreement provided that it was renewable at the option of Enterprises for 2 additional years to a period ending June 30, 1963.

For some time prior to 1955, Warehouse's facilities were an approved facility for the storing of Government grain under Commodity Credit Corporation loans or purchases. The bulk storage plant which was completed by Warehouse in its fiscal year ended June 30, 1957, at a cost of $165,784.48, was approved for storage of Commodity Credit Corporation grain and Warehouse was permitted, for tax purposes, accelerated amortization on this facility on a 5-year basis.

Warehouse on its income tax return filed for the fiscal period July 1, 1960, through September 2, 1960, reported a sale on August 26, 1960, of all its assets subject to liabilities to Water Co. for the sum of $700,000.

Lease arrangements with respect to rice warehouses and dryers were uncommon in the industry. There had been a few leases in the vicinity of Corpus Christi, Tex., which is much more removed from the rice-growing area than Warehouse's facilities at Rosharon, Tex. Around 1956 a small dryer near Bay City, Tex., approximately 60 miles from Rosharon, Tex., which did not have any warehouse facilities connected with it, was leased on a basis of 10 cents per barrel of rice dried.

During the war years of the 1940's, Warehouse's warehouse, which at that time had no drying facility and did not have the bulk storage facilities which were added during the 1950's, was leased for 1 year at a rental of $50,000 for the year.

The following schedule shows the annual receipts of rough rice at the Rosharon warehouse and dryer of Warehouse for the fiscal years ending June 30, 1950 through 1960, indicating the crop years in which the rice was grown:

| Year ending June 30— | Crop year | Wet or green barrels | | | |
|---|---|---|---|---|---|
| | | Total receipts | Rice Farms produced | Cotenant produced | "Public" produced |
| 1950 | 1949 | 168, 375 | | | |
| 1951 | 1950 | 183, 380 | | | |
| 1952 | 1951 | 255, 692 | | | |
| 1953 | 1952 | 283, 013 | | | |
| 1954 | 1953 | 287, 931 | 107, 146 | 107, 146 | 73, 639 |
| 1955 | 1954 | 294, 020 | 112, 793 | 112, 793 | 68, 434 |
| 1956 | 1955 | 318, 447 | 120, 540 | 120, 540 | 77, 367 |
| 1957 | 1956 | 280, 670 | 93, 798 | 93, 798 | 93, 074 |
| | | Warehouse Co.-Enterprises lease agreement in effect | | | |
| 1958 | 1957 | 264, 899 | 96, 939 | 96, 399 | 71, 561 |
| 1959 | 1958 | 265, 619 | 83, 419 | 83, 419 | 98, 781 |
| 1960 | 1959 | 276, 399 | 79, 560 | 79, 560 | 117, 279 |
| | 1960 | 302, 689 | 84, 579 | 84, 579 | 133, 531 |
| | 1961 | 300, 842 | 75, 410 | 75, 410 | 150, 022 |
| | 1962 | 327, 439 | 104, 901 | 104, 901 | 117, 637 |
| | 1963 | 350, 144 | 111, 058 | 111, 058 | 128, 028 |

The drying price per barrel of rice throughout this period of time was 50 cents and although the storage charge varied from time to time during the years here involved, generally the minimum storage charge was 35 cents per barrel including the "in and out" fee for the first month, 10 cents for the second month, and 5 cents for any additional time the rice was left until the end of the crop year at which time a warehouse would require the rice to be removed or some other arrangement to be made in order to prepare for the coming rice crop starting approximately July 1.

The quantity of rice which was put through the Rosharon dryer that would be sold rather than stored depended generally on the current market price paid at the rice mills for the rice as compared to the amount that the Commodity Credit Corporation approved as a Government loan with respect to the rice. Where the loan value was high as compared to the market price, a much higher percentage of rice would be stored than when the reverse situation existed.

There are certain risks in operating a rice dryer of damage to the rice which might lower its grade which are not generally covered by insurance as are the other risks connected with the rice drying and warehousing operations. Enterprises carried the insurance generally carried by other operators.

The fair market value of all of the properties owned by Warehouse which were subject to the lease agreement with Enterprises was not less than $700,000 as of June 30, 1957, June 30, 1958, June 30, 1959, and June 30, 1960.

On August 15, 1958, Warehouse filed with the district director of internal revenue at Austin, Tex., an application for tentative carryback adjustment claiming a carryback loss from the year ending June 30,

1958, to the year ending June 30, 1956, resulting in a decrease in tax in the amount of $17,181.75. On or about September 4, 1959, Warehouse filed an application for tentative carryback adjustment claiming a carryback loss from the year ending June 30, 1959, to the year ending June 30, 1956, resulting in a decrease in tax in the amount of $9,366.08. On August 11, 1960, Warehouse filed an application for tentative carryback adjustment claiming a carryback loss from the year ending June 30, 1960, to the year ending June 30, 1957, resulting in a decrease in tax in the amount of $6,442.44.

Respondent determined overassessments of income tax of $8,590.87, $17,956.96, and $6,442.44 for Warehouse's fiscal years ending June 30, 1955, 1956, and 1957, respectively, based on its claimed net operating loss carrybacks from its fiscal years 1958, 1959, and 1960.

### Additional Facts With Respect to Distributions to Individual Petitioners

Around the first of August 1960, S. M. Clements, J. E. Davant, R. Q. Pegram, E. W. Clark, and William S. Fly consulted the attorney in Houston, Tex., who had been representing Warehouse and Water Co. and the stockholders thereof for a number of years about the possible sale of the Warehouse properties to Water Co. This attorney advised that in his opinion if Warehouse adopted a plan of liquidation, thereafter sold its properties to Water Co. for the $700,000 which the individuals who called upon him were discussing as the possible price and distributed all its assets to its stockholders within 12 months, it would not be subject to any income tax on the gain on the sale of the properties because of the provisions of section 337 and the stockholders would pay tax as capital gains on the disposition of their stock. This attorney told these individuals that even though this was his opinion, revenue agents had been attempting to extend the definition of reorganization to include a situation where such a sale and distribution was made when the stockholders of the two corporations involved were identical, and that if they proceeded to have Warehouse adopt a plan of liquidation, sell its assets to Water Co., and distribute all of its assets to the stockholders, it was probable that some revenue agent would take the position that the stockholders had received a dividend. This attorney then advised these individuals that if the stockholders made a bona fide sale of their stock to someone not connected with them at a fair price and let that individual make a reasonable profit, in his opinion the transaction would be sustained under certain court decisions, and that the stockholders would pay tax on a capital gains basis for the difference in their basis in the stock and the sales price they received from the individual to whom the sale was made.

After some discussion S. M. Clements suggested that Homer L. Bruce, Jr., a practicing attorney and the son of the attorney whom these individuals had consulted, be selected as the person to buy the stock of Warehouse. Thereafter the attorney whom S. M. Clements and the other individuals had consulted talked to A. M. Ball, one of the vice presidents of the Bank of the Southwest. The firm of which this attorney was a member had represented the Bank of the Southwest for many years. Water Co. also had an account with the Bank of the Southwest. This attorney told A. M. Ball that Warehouse had approximately $230,000 on its bank account and that Homer L. Bruce, Jr., wanted to buy Warehouse's stock for $914,000. This attorney further told A. M. Ball that Homer L. Bruce, Jr., would put up the stock as collateral for the $914,000 note, and that although there would be no commitment agreement he thought that Water Co. would buy the assets of Warehouse.

Homer L. Bruce, Jr., was not present during the attorney's conversations with A. M. Ball. It was understood by the shareholders of Water Co. and Warehouse that they would go through the transaction as suggseted by the attorney and obtain $914,000 in cash and that title to all of Warehouse's properties except its cash would be conveyed to Water Co. and that Water Co. would pay over $700,000 to Warehouse, which together with the cash which Warehouse had in the bank would supply the $914,200 which the stockholders would receive and leave approximately $15,000 remaining for Homer L. Bruce, Jr., for his part in the transaction.

On August 26, 1960, the stockholders of Warehouse, their attorney who had arranged the transaction, Homer L. Bruce, Jr., and A. M. Ball met at the Bank of the Southwest in Houston, Tex. An instruction sheet had been prepared by petitioners' attorney on some date prior to August 26, 1960, reflecting the formal steps which were to be taken prior to August 26, 1960, and on August 26, 1960, in carrying out the planned transaction. This instruction sheet contained the following:

### SOUTH TEXAS RICE WAREHOUSE CO.

#### LIQUIDATION

*Things to do prior to August 26, 1960*

1. Both Warehouse Co. and Water Co. have signature cards at Bank of Southwest. No new ones needed.

2. Water Co. completes $500,000 loan and deposits $700,000 in Bank of Southwest.

3. Warehouse Co. deposits $230,000 in Bank of Southwest.

4. All stockholders have in Pegram's possession all stock certificates of Warehouse Co. and stock transfers executed to Homer L. Bruce, Jr.

5. The price to be paid for the stock is $914,200 or $182.84 per share as per memo attached.

6. The price to be paid each stockholder and the stock transfer stamps are as per memo attached.

7. Homer L. Bruce will get $365.60 in Federal and $82.64 in State stamps for stock transfers.

8. Homer L. Bruce will get $414.70 of Federal stamps for deed to Water Co. on basis of real estate of $377,000.

*Aug. 26, 1960*

9. HLB Jr borrows $914,200 from B of SW on demand note to be secured by all Whse Co. stock when bought.

10. HLB Jr delivers checks to each stockholder for his stock.

11. All old certificates are cancelled and one new certificate for 5,000 shares is issued to HLB Jr. and delivered by him to B of SW.

12. Warehouse Co. stockholders meeting:

a. HLB Jr signs waivers of notice of meeting.

b. HLB Jr. acts as Chairman and D. A. Culwell as Secretary.

c. Directors deliver their resignations.

d. Resolution accepting resignations, by-laws amended to provide for three directors, and HLB Jr. D. A. Culwell and Robert W. Hill are elected directors.

e. Plan of liquidation is adopted.

13. Warehouse Co. directors meeting:

a. All directors sign waiver of notice.

b. HLB Jr acts as Chairman and D. A. Culwell as Secretary.

c. All officers deliver written resignations.

d. Resolution accepting resignations and electing HLB Jr. Pres. & Treas. and D. A. Culwell Sec.

e. Bank resolution for account at B of SW.

f. Bank signature card signed with HLB Jr to sign checks and delivered to B of SW.

g. Letter proposal of Water Co. to buy assets for $700,000 is presented. Resolution authorizing its acceptance and sale.

h. President reports sale is completed.

i. President deposits Water Co.'s check of $700,000 in B of SW.

14. Resolution authorizing distribution of $929,583.30 to HLB Jr in cancellation of stock.

15. HLB Jr. pays B of SW $914,352.73 and B of SW surrenders note and stock and stock is cancelled.

16. Warehouse Co. gives HLB check for $414.70 for stamps on deed.

17. HLB Jr. executes Form 966 and Culwell as Secretary certifies to resolution on plan of liquidation and HLB Jr. signs and mails letter to District Director of Internal Revenue.

18. HLB Jr. as stockholder and HLB Jr. as President and Culwell as Secretary sign in duplicate Statement of Intent to Dissolve and HLB Jr sends letter to Secretary of State with $1.00.

19. Old stockholders through Pegram, Jr., reimburse HLB for stock transfer stamps:

| | |
|---|---:|
| Federal | $365. 60 |
| State | 82. 64 |
| | $448. 24 |

*Early September*

20. When duplicate of Statement of Intent to Dissolve is received back from Secretary of State, HLB Jr. President, and Culwell, Secretary, execute Articles of Dissolution and HLB Jr. sends letter to Secretary of State with $1.00.

| | | |
|---|---:|---:|
| South Texas Rice Warehouse Co. deposits_____ | $230,000.00 | |
| | 700,000.00 | |
| | 930,000.00 | |
| Price of stock $182.84_____ | 914,200.00 | |
| | 15,800.00 | |
| Revenue Stamps on deed on basis of $377,000 _____ | $414.70 | |
| Secretary of State_____ | 2.00 | |
| One day's interest on $914,200_____ | 152.37 | |
| Miscellaneous _____ | 200.00 | 869.07 |
| Balance _____ | | 14,930.93 |

At the time the parties met at the bank on August 26, 1960, all of the papers necessary to effectuate the transaction outlined in the instruction sheet had been prepared by petitioners' attorney and all arrangements necessary to carry out the transactions including the arrangement with the Bank of the Southwest had been made by petitioners' attorney. All of the various transactions set forth in the instruction sheet to occur on August 26, 1960, were carried out on that date at the meeting of petitioners, their attorney, Homer L. Bruce, Jr., and A. M. Ball at the Bank of the Southwest during a period of approximately 1 hour.

At the meeting Homer L. Bruce, Jr., executed a demand note to the Bank of the Southwest for $914,200 and the Bank of the Southwest credited his account with the amount of the demand note. All of the stock certificates of Warehouse properly endorsed were handed over during the meeting on August 26, 1960, at the Bank of Southwest to Homer L. Bruce, Jr., who had a new certificate issued to him which he assigned to the bank. Homer L. Bruce, Jr., signed the previously prepared papers of waiver of notice of meeting and the five directors of Warehouse delivered their previously prepared resignations. The previously prepared resolutions accepting such resignations and the election of new directors were signed and the new directors signed the minutes prepared for adoption of a plan of liquidation. The letter agreement of Water Co. was executed at the meeting on August 26, 1960, at the Bank of the Southwest and provided as follows:

We hereby offer to purchase from you the following properties owned by you for the consideration set forth opposite each item, all of which are situated in Brazoria County, Texas:

| | |
|---|---:|
| Rosharon Warehouse #1: | |
| Warehouse & Bins_____ | $20,000.00 |
| Sprinkler System_____ | 12,000.00 |
| Elevator & Sacking Equipment_____ | 3,000.00 |
| Seed Cleaning Equipment_____ | 7,000.00 |

| | |
|---|---:|
| Rosharon Sack & Twine Warehouse | $500.00 |
| Tenant Dwelling | 1,000.00 |
| Danbury Warehouse | 10,000.00 |
| Rice Dryer: | |
| Building | 125,000.00 |
| Sprinkler System | 8,000.00 |
| Machinery & Equipment | 225,000.00 |
| Quonset—Warehouse #2: | |
| Building | 40,000.00 |
| Sprinkler System | 4,000.00 |
| Machinery & Equipment | 15,000.00 |
| Fertilizer Warehouses | 3,000.00 |
| Pumphouse & Tank | 30,000.00 |
| Silo—Warehouse #3: | |
| Building | 145,000.00 |
| Machinery & Equipment | 25,000.00 |
| Automotive Equipment | 4,000.00 |
| Miscellaneous Office & Warehouse Equipment | 10,000.00 |
| Land upon which above buildings are situated | 12,000.00 |
| Town lot in Liverpool | 500.00 |
| Total | 700,000.00 |

In addition we offer to purchase from you all of your other assets and in consideration for such purchase we offer to assume all of your liabilities, and any liability therefor that might become owing by your stockholders or directors in the event that you are dissolved and agree to protect you and such stockholders and directors against any and all expenses that you or any of them may incur in connection with such liabilities.

The $700,000.00 consideration mentioned above is to be paid in cash.

It is understood that your Danbury warehouse is located upon a tract of land which you lease from a railroad.

It is also understood that all of your properties are now under lease to South Texas Rice Enterprises, a partnership, and the sale of your properties to us will be subject to that lease.

However, it is understood that there is to be excluded from the sale whatever amount of money you have on deposit with the Bank of the Southwest National Association of Houston, Texas, and the above mentioned $700,000.00.

If the foregoing is agreeable to you and you will note your acceptance on a copy hereof, this will constitute an agreement between us.

Yours very truly,

THE SOUTH TEXAS WATER COMPANY

By (S) R. Q. PEGRAM, Jr.

*President.*

ACCEPTED this 26th day of August, 1960.

SOUTH TEXAS RICE WAREHOUSE CO.

By (S) HOMER L. BRUCE, Jr.

*President*

Water Co.'s check for $700,000 was handed to Homer L. Bruce, Jr., and deposited by him in the Bank of the Southwest and the previously prepared resolution authorizing distribution of $929,583.30 to Homer

L. Bruce, Jr., in cancellation of stock was signed, and Homer L. Bruce, Jr., delivered a check for $914,352.72 to the Bank of the Southwest which surrendered to him his note and stock certificate and the stock was canceled. The checks drawn on August 26, 1960, and delivered to petitioners were for the following amounts for the petitioner indicated:

| Petitioner | Amount |
| --- | ---: |
| John E. Davant | $71,830 |
| Kathryn Davant Dodson | 65,300 |
| Mary Anne Davant Dunnam | 65,300 |
| Hortense E. Davant | 26,120 |
| L. D. Clements | 182,840 |
| Thurman S. Clements | 22,855 |
| Betty Dickson Clements Fly and William S. Fly | 22,855 |
| S. M. Clements | 137,130 |
| Marienne Clements Clark | 45,710 |
| E. W. Clark | 45,710 |
| Raye W. Pegram | 73,136 |
| R. Q. Pegram, Jr | 73,136 |
| Ray Beth Foster | 27,426 |
| Peggy Pegram Elliott | 27,426 |
| Joyce Pegram Jones | 27,426 |
| | 914,200 |

The $152.37 difference between the amount by which the Bank of the Southwest credited the account of Homer L. Bruce, Jr., on August 26, 1960, and the amount by which it debited his account on that date represented the bank's profit on the transaction which the parties designated as interest.

Homer L. Bruce, Jr., did not participate in determining the amount of $914,200 which was to be the purchase price of the stock under the planned transactions, nor in determining the amount of $700,000 which was to be the payment by Water Co. to Warehouse for the properties of Warehouse in accordance with the planned transaction.

No appraisals were made of the business or properties of Warehouse at any time during 1960. No appraisals of the properties or stock of Warehouse, and no financial statements of Homer L. Bruce, Jr., were furnished to the Bank of the Southwest in connection with the transactions heretofore described.

The transaction between Homer L. Bruce, Jr., and the Bank of the Southwest was approved by A. M. Ball of the Bank of the Southwest. Ordinarily A. M. Ball had authority to approve loans only up to $25,000 without prior approval of the discount committee of the bank. The discount committee of the bank did not approve the transaction with respect to the $914,200 credit on Homer L. Bruce, Jr.'s account for

the note delivered by him to the bank until subsequent to the occurrence of the transaction.

Commencing on August 26, 1960, the warehouse, buildings, and equipment transferred from Warehouse to Water Co. were reflected on the books and records of Water Co. as follows:

| Asset | Date acquired | Balance Apr. 30, 1961 | Rate of depreciation | Provision current year |
|---|---|---|---|---|
| | | | percent | |
| Flat warehouse—Rosharon No. 1: | | | | |
| Buildings and bins | Aug. 26, 1960 | $20,000.00 | 5 | $666.67 |
| Sprinkler system | ___do___ | 12,000.00 | 10 | 800.00 |
| Elevator and sacking equipment | ___do___ | 3,000.00 | 10 | 200.00 |
| Seed cleaning treatment | ___do___ | 7,000.00 | 10 | 466.67 |
| Sack and twine warehouse—Rosharon | ___do___ | 500.00 | 5 | 16.67 |
| Flat warehouse—Danbury | ___do___ | 10,000.00 | 5 | 333.33 |
| Rice dryer: | | | | |
| Building | ___do___ | 125,000.00 | 5 | 4,166.67 |
| Sprinkler system | ___do___ | 8,000.00 | 10 | 533.33 |
| Machinery and equipment | ___do___ | 225,000.00 | 10 | 15,000.00 |
| Quonset-Warehouse No. 2: | | | | |
| Building | ___do___ | 40,000.00 | 5 | 1,333.33 |
| Sprinkler system | ___do___ | 4,000.00 | 10 | 266.67 |
| Machinery and equipment | ___do___ | 15,000.00 | 10 | 1,000.00 |
| Fertilizer warehouses—two | ___do___ | 3,000.00 | 10 | 200.00 |
| Pumphouse and tank | ___do___ | 30,000.00 | 10 | 2,000.00 |
| Silo warehouse No. 3: | | | | |
| Building | ___do___ | 145,000.00 | 5 | 4,833.33 / 2,000.00 |
| Machinery and equipment | ___do___ | 25,000.00 | [1] 10 | 1,666.67 / 1,533.33 |
| Acquisition costs | ___do___ | 4,773.66 | 7½ | 238.68 / 397.61 |
| | | 677,273.66 | | 35,588.68 |

[1] Additional first year depreciation of $2,000 is claimed.

On and after August 26, 1960, the operation of the dryer and warehouse continued without interruption or change. August 26, 1960, falls in about the third week of the rice-drying season. As of June 30, 1960, the assets of Warehouse which were transferred on August 26, 1960, to Water Co. had a total original cost of $714,243.75 with an accumulated reserve for depreciation of $537,989.75, leaving a remaining undepreciated cost of $176,254. The fair market value of these assets on August 26, 1960, was not less than $700,000.

The accumulated earnings and profits of Warehouse as of June 30, 1960, without consideration of any adjustments which respondent made in his deficiency notice issued to Warehouse to which the petition in the instant case alleges errors was $160,132.29. The accumulated earnings and profits of Water Co. as of April 30, 1960, were $658,884.66 and the accumulated earnings and profits of Water Co. as of April 30, 1961, were $768,618.80.

In June 1963 Enterprises executed a lease agreement with Water Co. for the warehouse and dryer facilities that had been transferred to Water Co. on August 26, 1960, subject to the then-existing lease agreement between Enterprises and Warehouse, the terms of which were the same as the prior lease.

Respondent in his notice of deficiency to Warehouse included in the income of Warehouse for each of its taxable years ended June 30, 1958, 1959, and 1960, the earnings as reported by Enterprises on its partnership returns for the period June 1, 1957, through December 31, 1957, the calendar year 1958, and the calendar year 1959, respectively. In the alternative, respondent determined that, if the partnership and lease arrangement should be recognized, a reasonable rental for the assets of Warehouse was $78,000 per year and explained these determinations as follows:

It is determined that the gross income and deductions reflected in the records and returns of the partnership, South Texas Rice Enterprises, Rosharon, Texas, for the period from June 30, 1957 to June 30, 1960, were actually earned by or are attributable to you * * *

It is further determined that even if the "partnership" and "lease" arrangement should be recognized, as you have contended, the rental paid to this corporation for use of its assets by the South Texas Rice Enterprises partnership was inadequate and was not negotiated in an arm's length transaction. Thus, in any event, sufficient partnership gross income should be allocated to this taxpayer under the authority of section 482 of the Internal Revenue Code of 1954 to provide a reasonable rental of $78,000.00 per year.

Respondent in his notice of deficiency issued to each of the individual petitioners who were the stockholders of Warehouse and Water Co. determined that the entire amount received by each such petitioner in the transaction whereby such petitioner's stock in Warehouse was transferred constituted a distribution to such petitioner taxable as a dividend with the following explanation in each instance:

In your income tax return for the year 1960 you treated the receipt of cash of * * * [here is inserted the full amount of the check issued to such petitioner by Homer L. Bruce, Jr., in the transaction on Aug. 26, 1960] as full payment in exchange for your stock in South Texas Rice Warehouse Company. It is determined that such amount constitutes a distribution taxable as a dividend. Adjustments are, accordingly, made to eliminate the long-term capital gain reported from this transaction and treat the dividend as ordinary income.

Respondent, by second amendment to answer filed in each case of the individual petitioners, made the following alternative allegation:

That in the alternative, and in any event, if the Court should determine that there was a bona fide "sale" of properties by South Texas Rice Warehouse Company to South Texas Water Company, the respondent contends (whether said "sale" was a step in a reorganization or not) that to the extent the alleged consideration paid by South Texas Water Company to South Texas Rice Warehouse Company on August 26, 1960 exceeded the fair market value of the properties of South Texas Rice Warehouse Company on August 26, 1960, the excess of the amount allegedly paid over the actual fair market value of the properties represents a disguised dividend to the shareholders of Water Company funneled to them through South Texas Rice Warehouse Company and Homer Bruce, Jr.

This was followed by an allegation that the fair market value of the properties of South Texas Rice Warehouse on August 26, 1960, did not exceed $180,259, and that the difference of $519,326 represented a distribution to the shareholders of Water Co. as a dividend.

OPINION

Respondent contends that under the provisions of section 61(a)[4] and section 482,[5] he was correct in attributing to Warehouse all of the income and deductions of Enterprises. Respondent recognizes that taxpayers have a right to mold their business transactions in such manner as they see fit but contends that respondent may look at the actualities of the transaction, and if the form employed for doing business or carrying out a transaction is unreal, it is to be disregarded for tax purposes. *Shaw Construction Co.*, 35 T.C. 1102, 1113–1114 (1961) (and cases there cited), affd. 323 F. 2d 316 (C.A. 9, 1963).

The record in the instant case shows that after the formation of the partnership it was the partnership through the managing partner, E. W. Clark, and partnership employees, which operated the business of drying, cleaning, and warehousing of rice. This partnership was not a sham. It was organized for the business purpose of transferring to the adult children of L. D. and S. M. Clements, the fathers' interests in the rice drying and warehousing operation, while permitting the fathers to retain their ownership interest in the physical properties. The income earned by the partnership, except to the extent that the rental of the warehousing facilities is considered inadequate to reflect the value of those facilities for rental purposes in the operation of the business, was earned by the efforts and capital of the partners and was partnership income. *Interior Securities Corp.*, 38 T.C. 330 (1962); *Campbell County State Bank, Inc.*, 37 T.C. 430 (1961), reversed on another issue 311 F. 2d 374 (C.A. 8, 1963); and *Seminole Flavor Co.*, 4 T.C. 1215 (1945). The fact that the initial operating capital of the partnership was borrowed is not of consequence. It was the credit of the partners which procured the capital and the partners were liable for repayment of the loans. On the basis

---

[4] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(2) Gross income derived from business;

[5] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

of this record we do not sustain respondent in attributing all of Enterprises' income to Warehouse under section 61(a).

Respondent has broad discretion under section 482 in allocating income and deductions between related businesses where such allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such business. However, in the instant case the record clearly establishes that after July 1, 1957, the business of Warehouse was renting its facilities, and the business of Enterprises was operating the drying, cleaning, and warehousing facilities and the sales of rice incident thereto. For this reason we do not sustain respondent in allocating all of the income and deductions of Enterprises to Warehouse. Except to the extent that the rental charged was inadequate, the income and deductions of the rice drying and warehousing operations were properly those of Enterprises.

In the alternative, respondent determined that under section 482 rent in the amount of $78,000 a year should be allocated to Warehouse for the lease to Enterprises of its facilities. Petitioners' first position with respect to this allocation, or to any attribution under section 482 by respondent, is that the same interests did not control Warehouse and Enterprises within the meaning of section 482. Petitioners point out that the partners in Enterprises owned only 65 percent of the stock in Warehouse and contend that since the laws of Texas require approval of 80 percent of the stockholders of a corporation to authorize a lease of all or substantially all of the property of such corporation,[6] Enterprises and Warehouse were not organizations owned or controlled, directly or indirectly, by the same interests under the facts of this case. Petitioners point out that section 482 contains no provi-

---

[6] Tex. Bus. Corp. Act (1956) :

Art. 5.10. Sale or Mortgage of Assets Requiring Special Authorization of Shareholders

A. A sale, lease, exchange, mortgage, pledge, or other disposition of all, or substantially all, the property and assets, with or without the good will of a corporation, if not made in the usual and regular course of its business, may be made upon such terms and conditions and for such consideration, which may consist in whole or in part of money or property, real or personal, including shares of any corporation, domestic or foreign, as may be authorized in the following manner :

(1) The Board of directors shall adopt a resolution recommending such sale, lease, exchange, mortgage, pledge, or other disposition and directing the submission thereof to vote at a meeting of shareholders, which may be either an annual or a special meeting.

(2) Written or printed notice shall be given to each shareholder of record entitled to vote at such meeting within the time and in the manner provided in this Act for the giving of notice of meetings of shareholders, and, whether the meeting be an annual or a special meeting shall state that the purpose, or one of the purposes, of such meeting is to consider the proposed sale, lease, exchange, mortgage, pledge, other disposition.

(3) At such meeting the shareholders may authorize such sale, lease, exchange, mortgage, pledge, or other disposition and may fix, or may authorize the board of directors to fix, any or all of the terms and conditions thereof and the consideration to be received by the corporation therefor. Each outstanding share of the corporation shall be entitled to vote thereon, whether or not entitled to vote thereon by the provisions of the articles of incorporation. Such authorization shall require the affirmative vote of the holders of at least four-fifths of the outstanding shares of the corporation, and, in the event any class of shares is entitled to vote as a class thereon, such authorization shall require in addition the affirmative vote of the holders of at least four-fifths of the outstanding shares of each class of shares entitled to vote as a class thereon.

sion for the imputation of ownership or control because of ownership by related parties. Respondent's regulations [7] provide that the requisite control may exist even though not legally enforceable. "It is the reality of the control which is decisive, not its form or the mode of its exercise." In *Grenada Industries, Inc.,* 17 T.C. 231, 254 (1951), affd. 202 F. 2d 873 (C.A. 5, 1952), we referred to the similar provisions of the regulations under the comparable section of the 1939 Code as reflecting the type of control contemplated by the provisions of the statute. As we there stated, the significant thing is that control was in fact exercised by the same person.

Under the facts of the instant case, that common control of Warehouse and Enterprises exists is shown not only by the relationship of father and child with respect to the stockholders in Warehouse who permitted their family interest in the partnership to be taken over by their children but also by the fact that the entire operations of Enterprises were dependent on the overall family interests in various business entities. Obviously, for Enterprises to operate its rice drying and warehousing business, it was necessary that it not only have the lease of the dryer and warehousing facilities of Warehouse but also have available to put through its dryer the rice produced by Rice Farms on lands irrigated and leased from Water Co. Water Co. and Rice Farms were owned by the same individuals who owned the stock in Warehouse.

The facts here show that S. M. Clements and L. D. Clements merely permitted their children to take their respective portions of the drying, cleaning, and warehousing operations of the entire related businesses, but that in so doing they in no way changed the actualities of the overall control of the various family enterprises. We hold that the requisite common control under section 482 of Warehouse and Enterprises exists in the instant case. *Grenada Industries, Inc., supra,* and *Jesse E. Hall, Sr.,* 32 T.C. 390, 409–410 (1959), affd. 294 F. 2d 82 (C.A. 5, 1961).

Having concluded that the requisite common control exists between Warehouse and Enterprises, it is necessary to determine whether respondent's action in allocating $78,000 a year as the proper rent to Warehouse, thus attributing $30,000 a year of the income of Enterprises to Warehouse, is a proper exercise of his discretion under section 482. We have in many instances held that respondent has considerable discretion in applying the provisions of this section and that his determinations thereunder must be sustained unless such deter-

---

[7] Sec. 1.482–1(a)(3). Income Tax Regs.:

The term "controlled" includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.

minations constitute an abuse of the discretion granted him by the statute. *Seminole Flavor Co.*, 4 T.C. 1215, 1228 (1945), and cases there cited.

Petitioners take the position that the transactions between Enterprises and Warehouse in this case were arm's-length transactions resulting in a fair and reasonable rent and that, therefore, respondent exceeded his discretion in allocating additional rental under section 482. See *Interior Securities Corp.*, *supra*. Petitioners contend that they have introduced evidence that the rental charged was fair and reasonable and that such evidence is uncontroverted and unimpeached, and therefore should be accepted, relying on *Anaheim Union Water Co.* v. *Commissioner*, 321 F. 2d 253 (C.A. 9, 1963), affirming in part and reversing in part 35 T.C. 1072. Petitioners' evidence consisted of the testimony of several of the partners and of a witness offered as an expert. Two of the partners who testified were J. E. Davant and R. Q. Pegram, Jr. Each of these witnesses stated that in his opinion the rental of $48,000 a year for the Warehouse properties was high and that he did not think that he would have gone into the partnership if the rental had been higher than $50,000 a year. Neither witness gave any persuasive reason as to why he considered the rental provided for in the lease agreement as "on the high side." The statement of each that he did not think he would have gone into the partnership had the rental been higher is totally unpersuasive in light of the fact that each of these individuals owned the identical interest in Warehouse that he owned in Enterprises, and other than the tax effects, it could make little difference to them which business enjoyed profits.

There was considerable testimony as to the negotiations which took place between representatives of Enterprises and S. M. Clements and L. D. Clements who were stockholders in Warehouse but not partners in Enterprises. While we do not doubt that the matter was negotiated and the result of the negotiation was the $48,000 figure, the logical inference for the record as a whole is that the negotiation was not an arm's-length one but was for the purpose of satisfying the condition that the attorney who had been consulted by the prospective partners had placed as a requirement for the transaction not being questioned taxwise, "That they could lease the property but * * * would have to pay a reasonable rent." The negotiations were not arm's length in the sense of two unrelated parties negotiating to arrive at a rental value which each for his own business interests is willing to accept.

There is ample evidence in the record to show that the $48,000 a year rental was not a fair rental for Warehouse's properties. In the first place, two of the partners stated that in their opinion the fair market value of the properties which were leased by Enterprises was, at no time from June 30, 1957, throughout the period here involved,

less than $700,000.[8] In connection with the cases of the individual stockholders, the record of which was not included in the case of Warehouse, there is other evidence as to the fair market values of the properties which we will discuss in disposing of the issues in that case. In the case of Warehouse, we view the statements of the two partners that the fair market value of the assets of Warehouse was at no time from June 30, 1957, throughout the years there involved, less than $700,000 as in the nature of an admission. These witnesses in no way reconciled their opinion as to a fair rental value of the assets with their testimony as to the fair market value of those assets. This failure to explain two opinions which without such explanation seem inconsistent persuades us to give little weight to the opinion as to rental value of these interested witnesses. The burden is on petitioner to establish a fair rental value for properties of a lesser amount than the $78,000 a year determined by respondent.

Since the properties which Enterprises leased from Warehouse were geared to and designed for use in a rice drying, cleaning, and warehousing business, it was incumbent upon petitioner to explain, if in fact an explanation exists, why many of the same factors which would go into a determination of a fair market value of the properties would not likewise be relevant to a determination of a fair rental value thereof. The evidence shows that during the 1940's when Warehouse's assets did not include a dryer or bulk storage of any consequence, it leased its facilities for 1 year at a rental of $50,000.

The evidence further shows that there were very few rentals of drying or warehousing facilities in the rice industry, and the one about which any witness knew of his personal knowledge which had occurred at around the time of the lease which is here involved, had been a dryer without storage facilities of any kind at 10 cents a barrel. A rate of 10 cents a barrel for dryer rental and $50,000 for the warehouse rental in each of the years here involved would approximate the $78,-000 a year rental determined by respondent. Although the witnesses testified that the storage warehouse for sack storage had suffered some obsolescence after dryers became prevalent in the late 1940's, they recognized that these facilities were useful for certain purposes. None of these witnesses attempted to assign any rental value to such facilities apart from the drying and bulk storage facilities. The bulk storage facilities during the years here involved were for 136,000 barrels as compared to sack storage facilities for 100,000 barrels.

There are other facts of record that are persuasive against petitioners' contention that $48,000 was a fair rental for the properties of

[8] One of the witnesses who so testified was E. W. Clark, who had written a letter to a revenue agent on Mar. 24, 1960, in which he stated, "the stockholders of this company agreed that the figure of $600,000 represented the maximum market value of the physical properties."

Warehouse. Only shortly before the date of this lease, Warehouse had built a new bulk storage facility, which had been completed in Warehouse's fiscal year ended June 30, 1957, at a cost of over $165,000, on which it was permitted accelerated amortization on a 5-year basis. We recognize, as petitioners argue, that a facility does not necessarily depreciate at a rate on which accelerated amortization is allowed since such allowance is generally for a facility needed in some government program which might be short range. Nevertheless, the building of this facility to be amortized over such a short period indicates that its rental value over that period should at least equal the amortization allowed absent some explanation which would lead to a contrary inference. If the approximate $33,000 a year of amortization on this facility were considered as a fair rental value of that facility, only $15,000 of the $48,000 rental provided for in the lease remains for all of Warehouse's other facilities.

The testimony as to the standard charges for drying and storing rice indicates that a facility of the capacity of that owned by Warehouse would be worth a rental in excess of $48,000 on the basis of its possibility of engendering income. Petitioners' expert witness, in attempting to justify his conclusion as to the rental value in the face of the quantity of rice put through Warehouse's dryer at Rosharon, stated that Enterprises was only sure of getting the rice controlled by Rice Farms and was not sure of getting the cotenancy or public rice. The reasonableness of this conclusion in the light of the history of the use of Warehouse's facilities by the cotenants of Rice Farms and other farmers whose water supply came from Water Co. is subject to grave question. In any event, a fair rental would not be determined on an absolute sure quantity of rice to go through the dryer, but on the prospects of the amount of business that a competently handled operation might reasonably expect to obtain. Certainly, no owner of a facility would, in an arm's-length transaction, rent that facility on a rental determined solely from the quantity of rice which it was sure that the lessee operator of the facility could obtain for drying and warehousing.

The expert witness offered by petitioners had no reasonable foundation for his opinion as to a fair rental value. This witness had been in the rice business for many years and showed a reasonable knowledge of the replacement costs of facilities and market values of warehousing and drying facilities. He showed no familiarity with rentals of any facilities, and, in fact, at no point in his testimony testified that he had personal knowledge of any other such rentals. He was unable to explain why many of the factors which he would consider in determining the fair market value of a facility should not be considered in determining its fair rental value.

On the basis of the record as a whole, we sustain respondent in attributing $78,000 a year rental to Warehouse under section 482.

Respondent takes the position that the transfer by the individual petitioners of their stock to Homer L. Bruce, Jr., was not a sale but was merely a sham transaction in effectuating a transfer of the assets of Warehouse to Water Co., and the distribution of a dividend to petitioners. It is respondent's contention that the transfer of the assets of Warehouse to Water Co. is a reorganization, either under section 368(a)(1)(F) or 368(a)(1)(D), and that since the entire business of Warehouse was transferred over to Water Co. there was in substance no liquidation of Warehouse so that the entire distribution should be viewed as a dividend out of earnings and profits of the two corporations.

Petitioners take the position that the sale of Warehouse's stock by them to Homer L. Bruce, Jr., was a bona fide sale and they properly reported the gain on the sale as capital gain. Petitioners contend that even if the sale by them to Homer L. Bruce, Jr., is ignored, the substance of the transaction is the adoption of a plan of liquidation by Warehouse with a subsequent sale of its assets to Water Co. on which no gain to Warehouse is recognized because within a year after the sale all of the assets of Warehouse were distributed to its stockholders pursuant to the plan of liquidation. Petitioners argue that viewed in this manner the tax result is the same as reported by them since distributions in complete liquidation of a corporation are taxable as a sale or exchange of a capital asset under the provisions of section 331. Petitioners contend that in any event the portion of the distributions to petitioners taxable as a dividend is limited to the accumulated earnings and profits of Warehouse as of August 26, 1960, unless the amount paid by Water Co. to Warehouse for the properties was in excess of the fair market value of those properties and therefore might be considered indirectly as a dividend to petitioners from Water Co. through a payment in excess of the fair market value for Warehouse's assets.

Petitioners argue that under the decisions in *Clara M. Tully Trust*, 1 T.C. 611 (1943); *W. P. Hobby*, 2 T.C. 980 (1943); and *Sun Properties* v. *United States*, 220 F. 2d 171 (C.A. 5, 1955), the sale here should be recognized as a true sale even though it was made for the admitted purpose of obtaining a tax advantage. Those cases are distinguishable from the instant case by the fact that the person to whom the sale was made in those cases had complete control over the property after the sale. Here, although the planned transaction provided for no written agreement as to the acts Homer L. Bruce, Jr., would take with respect to the stock after it was transferred, the stock sale, the loan from the bank, the liquidation resolution, and the offer to purchase

the assets by Water Co. were all performed in a short period of time on the same day. All the papers including the offer of Water Co. to purchase the assets had been prepared prior to the transfer of the stock to Homer L. Bruce, Jr., in the purported sale.

The facts in this case show that Homer L. Bruce, Jr., was not a purchaser of the stock in any real sense but merely a conduit through which funds passed from Water Co. to Warehouse and from Warehouse to petitioners. Although as stated in *Sun Properties* v. *United States, supra,* a sale is no less a sale because it is planned to minimize taxes, a transfer of stock with a prearranged understanding of the disposition of such stock or the disposition of the corporate assets is not in reality a sale. The prearrangement of the transactions to follow the transfer of the stock was so understood by all parties that no control over the stock purportedly sold passed from petitioners to Homer L. Bruce, Jr. Control over property is an essential element of its ownership. Apparently none of the bank's money ever actually passed out of the bank. The credit of the $914,200 on the account of Homer L. Bruce, Jr., for which he gave a note to the bank was coincident with the transfer over to the bank of approximately $230,000 from the bank account of Warehouse and $700,000 from the bank account of Water Co. These funds were forthwith used to pay the note of Homer L. Bruce, Jr., to the bank. In reality the bank never lent any money to Homer L. Bruce, Jr., but Homer L. Bruce, Jr., merely distributed out to petitioners the money in Warehouse's bank account, and the $700,000 represented by the check drawn by Water Co. to Warehouse.

Whether or not a bona fide sale has occurred is governed by the substance of the transaction and not its form. *Higgins* v. *Smith,* 308 U.S. 473 (1940). The question is to be decided from consideration of both the form and substance of the transaction and the situation existing at the end thereof. *United States* v. *General Geophysical Co.,* 296 F. 2d 86 (C.A. 5, 1961). Cf. *Ethel K. Lesser,* 26 T.C. 306 (1956).

Considering all of the facts with respect to the transfer by petitioners of their stock to Homer L. Bruce, Jr., we hold that this transfer did not constitute a bona fide sale of petitioners' stock to Homer L. Bruce, Jr.

In support of their position that even if the role of Homer L. Bruce, Jr., in the transaction is disregarded, each petitioner properly reported the difference between his basis in Warehouse's stock and the amount received by check from Homer L. Bruce, Jr., as capital gains, petitioners summarize what they consider the pertinent facts as follows:

Following an election by its stockholders to dissolve the Company, the Warehouse Company entered into an agreement with the Water Company by which the Warehouse Company would transfer its assets, except cash, subject to its

liabilities, to the Water Company in consideration of $700,000 cash. After both companies had performed their agreement, and within 12 months from the election by the stockholders to dissolve the Company, Warehouse Company distributed its assets, consisting solely of cash, to its stockholders in redemption of the Warehouse Company stock.

If Warehouse and Water Co. had been unrelated companies, it would be apparent from petitioners' summary of the facts that under section 337 no gain would be recognized to Warehouse on the sale of its assets after the adoption of a plan of liquidation since all of its assets were distributed to its stockholders within 12 months and that the gain realized by the stockholders upon receipt of the cash from Warehouse would be treated, under section 331, as gain realized from the sale of the stock. What petitioners overlook in their analysis is that the stock ownership of Warehouse and Water Co. was identical and that after the transfer of Warehouse's assets to Water Co., Water Co. continued to operate with those assets identically the same business previously operated by Warehouse. Water Co. took the assets subject to Warehouse's lease and its business with respect to those assets consisted solely of leasing the assets to Enterprises just as had Warehouse's business for the 3 years prior to the transfer.

On July 1, 1963, Water Co. itself entered into a lease with Enterprises with the same terms and provisions as the lease which Enterprises had had with Warehouse at the time the assets were transferred.

The parties cite and discuss numerous cases, some holding transactions not in form a reorganization to in fact constitute a reorganization and others holding the form and substance of the transaction to be such that it does not constitute a reorganization. No purpose would be served in discussing these various cases since the facts in the instant case are indistinguishable from the facts in *James Armour, Inc.*, 43 T.C. 295 (1964), and on the basis of our decision therein we hold that the transfer by Warehouse of its assets to Water Co. constituted a reorganization under section 368(a)(1)(D).[9]

Petitioners' primary argument that the transaction here involved does not fall within section 368(a)(1)(D) is that no stock was issued

---

[9] SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

  (a) REORGANIZATION.—

    (1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

      \*        \*        \*        \*        \*        \*        \*

      (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

by Water Co. to either Warehouse or the stockholders of Warehouse in return for the assets, but the transaction was altogether a sale of the assets by Warehouse to Water Co.

Petitioners answer respondent's argument that under the decision of the Court of Appeals in *Commissioner* v. *Morgan*, 288 F. 2d 676 (C.A. 3, 1961), reversing 33 T.C. 30, certiorari denied 368 U.S. 836 (1961), it is unnecessary that actual stock be issued where the stockholders in each of the two corporations are identical with identical interests so that the issuance of additional stock would be a meaningless gesture by contending that the Court of Appeals erred in its decision in the *Morgan* case.

Petitioners argue that in any event the facts here are distinguishable from those in the *Morgan* case since in *Commissioner* v. *Morgan, supra,* the assets which were necessary to engage in the same business which the transferor had engaged in prior to the transfer were received by the transferee without any consideration. Petitioners state that it is therefore probable, or at least possible, to say that the transferee gave its stock in exchange for these assets but since the transferee was already 100 percent owned by the taxpayer its actual physical issuance and delivery of certificates were unnecessary. Petitioners state that in the instant case the transferee corporation paid a full and adequate consideration for the assets and therefore nothing remains for which stock might have been issued. In the recent case of *James Armour, Inc., supra,* we stated:

They [the taxpayers] argue that *Commissioner* v. *Morgan, supra,* is not proper authority for holding in the instant case that there was in effect an exchange of stock, as required by the statute, since in that case the transferor corporation transferred to the transferee corporation valuable assets without consideration. It is true that in that case the transferor corporation transferred to the transferee corporation possession of, and the right to use, if not the title to, certain investment statistical and research material, without consideration. However, as we read the opinion of the court in that case, the holding that the exchange requirement of section 112 (b)(3) and (c) was met was not based upon the reasoning that in effect stock of the transferee corporation was issued to the transferor corporation in exchange for any assets transferred without consideration. Rather, we construe that case as holding that the exchange requirements are met if, when a series of transactions is completed, the stockholders of the old corporation retain their proprietary interest in the same going business, although in another corporate shell. To the same effect is *Liddon* v. *Commissioner, supra* [230 F. 2d 304 (C.A. 6, 1956), affirming 22 T.C. 1220 (1954), certiorari denied 352 U.S. 824]. As pointed out above, that is the situation in the instant case. We find nothing in *Turnbow* v. *Commissioner*, 368 U.S. 337, cited by the petitioners, to militate against the conclusion reached herein that all the elements necessary to a reorganization are here present.

Since no distinction exists between *James Armour, Inc., supra,* and the instant case, we hold that the result of the whole transaction here was a reorganization under section 368(a)(1)(D) and that under

sections 354 [10] and 356 [11] petitioners received a taxable dividend to the extent of the earnings and profits of Warehouse. Further, following our decision in *James Armour, Inc., supra*, we hold that the amount of the distribution by Warehouse through Homer L. Bruce, Jr., to petitioners was a dividend only to the extent of the earnings and profits of Warehouse and the balance is to be treated as capital gains to the extent that it exceeds the basis of petitioners in their stock.

We have found as a fact that the fair market value of the assets transferred by Warehouse to Water Co. was at least $700,000 and this finding disposes of respondent's alternative contention with respect to a dividend to petitioners from Water Co.

Petitioners' expert witness who had many years' experience in the rice business and showed some degree of knowledge as to both construction costs and sales prices of drying and warehousing facilities, estimated a total value of the property and equipment of Warehouse as of August 26, 1960, of $873,000, based on replacement costs of the type of facility that Warehouse had, discounted in some instances for depreciation. No useful purpose would be served by recounting in detail the testimony of petitioners' expert witness. He pointed out that the dryer and bulk storage facilities were modern and of the type currently being constructed. He valued the old warehouse by giving no value to the portion of the space which was obsolete and considering the replacement cost of only the usable portion. He did not include a value for the land on which railway spurs were located or the unused

---

[10] SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.

 (a) GENERAL RULE.—
  (1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.
  (2) LIMITATION.—Paragraph (1) shall not apply if—
   (A) the principal amount of any such securities received exceeds the principal amount of any such securities surrendered, or
   (B) any such securities are received and no such securities are surrendered.
  (3) CROSS REFERENCE.—
 For treatment of the exchange if any property is received which is not permitted to be received under this subsection (including an excess principal amount of securities received over securities surrendered), see section 356.
 (b) EXCEPTION.—
  (1) IN GENERAL.—Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a)(1)(D), unless—
   (A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and
   (B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.
[11] SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION.
 (a) GAIN ON EXCHANGES.—
  (1) RECOGNITION OF GAIN.—If—
   (A) section 354 or 355 would apply to an exchange but for the fact that

land although he recognized this land was valuable. His testimony as to the fair market value of the properties was persuasive and supports a fair market value of the assets in excess of $700,000 as of August 26, 1960.

There are in the record the cost figures on these properties and the depreciation previously allowed which left a remaining basis to Warehouse in the properties on August 26, 1960, of approximately $180,000. In a letter dated March 24, 1960, E. W. Clark as president of Warehouse stated that the stockholders considered $600,000 to be the maximum fair market value of the properties about June of 1957. Since the lowest possible value was to the advantage of the petitioner on whose behalf E. W. Clark as president wrote this letter, we do not consider this statement as inconsistent with a $700,000 value as of August 26, 1960, at which time certain additions had been made to the facilities not included therein on June 30, 1957. It is not uncommon for increases in market values between the date of acquisition of an asset and a subsequent date to be so great that the fair market value at a subsequent date is in excess of the depreciated basis of the property. See *Macabe Co.*, 42 T.C. 1105 (1964).

Respondent argues that the fair market value was less than $700,000 since the rental agreement in effect on August 26, 1960, provided for a yearly rental of these properties of $50,000. We have previously held the fair rental value of these properties for the fiscal years ended June 30, 1958, 1959, and 1960 to be $78,000. One of our reasons for so holding is that the evidence as a whole shows that the fair market value of the properties on those dates was not less than $700,000. The evidence also shows a fair market value on August 26, 1960, of not less than $700,000.

In *James Armour, Inc., supra*, respondent made the argument that a portion of the distribution to the taxpayers there involved should be considered as coming from the transferee of the property to the extent that the cash paid for the property by the transferee corporation to the transferor corporation exceeded the basis of the property transferred. In summarizing respondent's argument, we stated:

His reasoning is that since the basis of the construction equipment in the hands of Excavating would be the carryover basis of $163,528.76, Excavating received nothing it could use for income tax purposes (for calculation of depreciation

---

(B) the property received in the exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money,

then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

(2) TREATMENT AS DIVIDEND.—If an exchange is described in paragraph (1) but has the effect of the distribution of a dividend, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property.

and calculation of gain or loss) in return for the difference of $457,246.22, and that hence the assets of Excavating had been depleted by $457,246.22, thus laying the foundation for the claim that there had been a distribution of a dividend by it in that amount.

We there stated that there was no merit to this contention since the amount which had been paid by the transferee corporation to the transferor corporation did not exceed the fair market value of the property transferred.

In accordance with our holding in *James Armour, Inc.*, *supra*, we hold that the distributions to petitioners by Warehouse on August 26, 1960, were dividends taxable to petitioners as such to the extent of the earnings and profits of Warehouse as of that date, recomputed with the adjustments we have held necessary in determining the tax liability of that company for the years here in issue, and that to the extent the distributions to petitioners exceed the earnings and profits of Warehouse as of August 26, 1960, they represent a return of capital to each petitioner of his basis in his stock and the remaining portion represents long-term capital gain.

*Decisions will be entered under Rule 50.*