Dorba Homes, Inc., et al. * v. Commissioner. Dorba Homes, Inc. v. Commissioner
Docket Nos. 972-65 - 981-65, 993-65.
United States Tax Court
T.C. Memo 1967-150; 1967 Tax Ct. Memo LEXIS 110; 26 T.C.M. (CCH) 693; T.C.M. (RIA) 67150; July 13, 1967
*110 Petitioners were corporations, formed and owned either by Cook and Caldwell jointly, or individually, or jointly with their wives, and were all engaged in various phases of the real estate business conducted in the name of Caldwell & Cook, a partnership in which Cook and Caldwell were equal partners. Held, each of the corporations was a viable entity which earned its own income through its own business activities, and the net income of the other 10 corporations for the years here involved is not taxable to corporate petitioner, Caldwell & Cook, Inc., under either sec. 61 or sec. 482, I.R.C. 1954. Held, further, surtax exemptions allowed to 3 of the other 10 corporations and disallowed to the remaining 7 corporations under sec. 269, I.R.C. 1954. Thomas F. McIntyre, Liberty Bank Bldg., Oklahoma City, Okla., and Percival D. Oviatt, Jr., for the petitioners. Stephen M. Miller, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: In these consolidated proceedings, respondent determined the following deficiencies in income tax of the following petitioners for the following taxable years: Taxable
Dkt.
Year
No.
Petitioner
Ending -
Deficiency
Jan. 31,
972-65
Dorba Homes, Inc.
1959
$ 5,455.59
1960
5,500.00
1961
5,373.73
1962
5,500.00
Apr. 30,
973-65
Dewmar Construction
Co., Inc.
1961
4,123.67
1962
5,500.00
May 31,
974-65
Woodcroft Construc-
tion Co., Inc.
1961
5,467.42
1962
5,500.00
Dec. 31,
975-65
Velmar Homes, Inc.
1958
5,500.00
1959
5,467.97
1960
4,481.06
1961
5,500.00
Mar. 31,
976-65
Powder Mill Homes,
Inc.
1961 [1]
4,974.85
1962
5,500.00
June 30,
977-65
Lumar Homes, Inc.
1960 [2]
3,915.57
1961
5,500.00
1962
5,500.00
Nov. 30,
978-65
Landorama, Inc.
1961 [3]
5,500.00
June 30,
979-65
Monroe Builders'
Service Co., Inc.
1958
$ 2,213.29
1959
4,740.60
1960
5,303.29
1961
3,827.97
1962
44.05
Jan. 31,
980-65
Sierra Construction
Co., Inc.
1960
5,500.00
1961
3,891.92
1962
5,500.00
Aug. 31,
981-65
Mendon Homes, Inc.
1961 [4]
5,500.00
Dec. 31,
993-65
Caldwell & Cook, Inc.
1958
56,158.47
1959
81,679.06
1960
84,064.99
1961
155,371.26
*111 There are two issues for decision: (1) Whether the income reported by each of 10 related corporations, petitioners herein, is to be attributed to Caldwell & Cook, Inc., the 11th petitioner herein, for the taxable periods under review under sections 61 and 482, I.R.C. 1954; [1] or, in the alternative, (2) whether the corporate surtax exemption for which provision is made under section 11 of the Code is to be disallowed to each petitioner other than Caldwell & Cook, Inc., [2] under section 269 of the Code. *112 Findings of Fact Some of the facts have been stipulated and are found accordingly. For clarity, facts relating to the formation of each of the corporate petitioners will first be set forth separately, and then general facts relating to all of the petitioners will follow. Each petitioner, for the taxable periods for which deficiencies have been determined, filed Federal corporation income tax returns with the district director of internal revenue, Buffalo, N. Y. Each petitioner is a New York corporation. In 1946, Ellery J. Caldwell (hereafter referred to as Caldwell) and Gerald E. Cook (hereafter referred to as Cook) formed a partnership, Caldwell & Cook, in which the two men were equal partners, to engage in the business of dry wall construction in partially completed houses in the vicinity of Rochester, N. Y. The partnership was successful and, in 1949, branched out into the construction of houses and, later, into subdividing building tracts. In order to obtain the benefit of insulation from personal liability in their business, Cook and Caldwell formed Caldwell & Cook, Inc., as a New York corporation on September 30, 1952. The capital stock of Caldwell & Cook, Inc., consists of 200 *113 shares of no-par common stock of which 100 shares were issued to the partnership, Caldwell & Cook. [3] No other shares were issued. Original capitalization of the corporation was $20,000; its present capitalization is $72,000. Cook was president and Caldwell was vice president of the corporation. Prior to the formation of Caldwell & Cook, Inc., the partnership had performed all functions pertaining to buying and developing land, constructing and selling, completed houses. Upon incorporation of Caldwell & Cook, Inc., the corporation assumed most of the operations of the partnership. Between 1952 and 1954 the partnership was generally inactive, engaging, in a minor way, in the insurance business. In July 1953, Caldwell & Cook, Inc., experienced rather severe labor troubles. Although none of its employees belonged to a union, and none *114 of the unions claimed to represent their employees, representatives of the local Allied Trades Council informed Cook and Caldwell that if they did not sign a union contract and recognize the unions as bargaining agents, forms of economic coercion would be used to force Caldwell & Cook, Inc., to employ only union labor. Such coercion was applied by the unions in various forms from July to September of 1953 to the extent that it became very difficult for Caldwell & Cook, Inc., to get necessary supplies and have installed some of the utilities required to complete houses they were building for delivery at specific times under contract. On August 11, 1953, Caldwell & Cook, Inc., petitioned the New York State Labor Relations Board for a certification of representatives and at an election held in November the employees voted unanimously against the unions. Also, in September 1953, Caldwell & Cook, Inc., commenced an action against several of the unions for an injunction and for damages. After negotiations these unions agreed to cease picketing and other activities until the action was finally adjudicated; and Caldwell & Cook, Inc., agreed to and did suspend the action, although it was not *115 dismissed. After the labor difficulty Cook and Caldwell wanted to take steps to assure that it would not be repeated. They decided to separate the business into an "owning company" (or companies), which would own the lots where houses were to be built, and a "construction company" (or companies), which would contract with the "owning company" for the construction of houses. Their thought was that the "owning company" should have no employees and would therefore be secure against labor activity of the kind they had experienced. They also felt any labor activity could be directed only against the "construction company" and, if the "construction company" did have difficulty with unions, the "owning company" could contract with other unrelated contracting companies to have houses completed. [4] *116 Under their plan, Caldwell & Cook, Inc., was to be the "owning company" and would be divorced completely from actual construction of houses and its activities would be devoted entirely to land development, promotion, and sales. Cook believed [5] that the corporation should engage only in intrastate activity so that it would have access to local courts in the event of a labor dispute. Furthermore, Cook and Caldwell each desired to form his own corporation which would be separate and apart from the other's corporation. They had recently been involved as minority stockholders in a land development corporation in connection with which they discovered to their regret that a single corporation could involve the stockholders in irreconcilable disagreements which eventually forced the minority stockholders to withdraw. Cook and Caldwell therefore decided that each would form a construction company to build houses on property owned, promoted, and developed by Caldwell & Cook, Inc., with each employing the skilled construction employees of Caldwell & Cook, Inc., as they were needed. However, they found that neither of their corporations could employ all of the employees at one time and that it was not feasible for the workmen *117 to work part time for one corporation and part time for the other; inconvenience resulted from maintaining two sets of employment records, and there were added workmen's compensation insurance and social security payments. Consequently, they decided to form a third corporation which would employ all of the workmen and would subcontract with the "construction corporations" to supply skilled labor to them for construction of homes. The above views of Cook and Caldwell were presented at a meeting of the board of directors of Caldwell & Cook, Inc., on June 1, 1954, at which the following resolutions were adopted: RESOLVED, that it is for the best interest of the corporation that it cease engaging in the work of constructing and erecting houses and that it contract with other firms for the performance of such work as soon as the corporation can complete the houses which it now has under construction, or as soon as it can in an orderly manner arrange with other corporations to be formed for the hire of the men in its employ to the extent that such employees will not become unemployed * * *
RESOLVED that the officers of this corporation be and they hereby are authorized to contract with other *118 organizations including corporations which may be formed by either of them for the construction and erection of residences, houses, etc. on building sites owned by this corporation. As a result of the above action and according to their plans, the following corporations were formed. Sierra Construction Co., Inc. This corporate petitioner (hereafter referred to as Sierra) was organized June 29, 1954. Ten shares of no-par common stock, representing all of the issued and outstanding stock of the corporation, were issued to Cook. This corporation was to be Cook's "construction" corporation. Original capitalization was $1,000; present capitalization is $40,000. Woodcroft Contruction Co., Inc. This corporate petitioner (hereafter referred to as Woodcroft) was also organized June 29, 1954, with 10 shares of no-par common stock, being all of its issued and outstanding stock, being issued to Caldwell. This was to be Caldwell's "construction" corporation. Original capitalization was $1,000; present capitalization is $70,000. Monroe Builders' Service Co., Inc. This corporate petitioner (hereafter referred to as Monroe) was organized on July 14, 1954, shortly after the formation of Sierra *119 and Woodcroft, pursuant to Cook's and Caldwell's desire to form a corporation which would employ, on a full-time basis, the workmen who had formerly worked for Caldwell & Cook, Inc., and which would contract for the workmen's services with the "construction corporations" organized by the two men. Twenty shares of Monroe's no-par common stock were issued to Cook and 20 shares were issued to Caldwell, being the only stock issued by the corporation. Original capitalization was $4,000; present capitalization is $50,000. Caldwell and Cook felt that Monroe's operations should be limited to strictly intrastate commerce so that if labor trouble recurred Monroe would have access to State rather than Federal tribunals; and they thought that if Monroe simply hired workmen and contracted with the "construction" corporations for their services it would be engaged solely in intrastate commerce. Sometime after the formation of Sierra and Woodcroft, Cook and Caldwell decided that each would form an "owning corporation" which, independently of each other and of Caldwell & Cook, Inc., would buy lots, have houses built on them by the construction companies, and sell them to the public. As a result of *120 this decision the following corporations were formed. Velmar Homes, Inc. Velmar Homes, Inc. (hereafter referred to as Velmar), was organized August 5, 1955. All of the issued and outstanding stock of the corporation, 10 shares of no-par common, was issued to Caldwell. Original capitalization was $1,000; present capitalization is $60,000. This corporation was formed to be Caldwell's solely owned "owning corporation." Velmar bought lots and contracted with the "construction" companies for the building of houses. It had no construction activities of its own and employed no labor. At times it subcontracted construction activity to Monroe and to various supply and subcontracting companies in the area. Caldwell, out of apprehension about labor union trouble, limited Velmar to "owning corporation" functions. Dorba Homes, Inc. This corporate petitioner (hereafter referred to as Dorba) was organized, as was Velmar, to be an "owning corporation," except that Dorba was to be Cook's solely owned corporation. It was organized on May 3, 1956. Upon incorporation, its total issued and outstanding stock, 10 shares of no-par common stock, was issued to Cook. Original capitalization was $1,000; present *121 capitalization is $50,000. This corporation engaged in the same type activities as did Velmar. At some time while Cook and Caldwell were deciding to have separately owned corporations for the ownership, development, and construction of improvements on real estate in which they might be jointly intertested, it occurred to Cook that he should establish a corporation with his wife as the principal owner so that in the event of his death she would have property that was not a part of his estate and would not be involved with his real estate activities. As a result thereof Cook caused to be formed: Dewmar Construction Co., Inc. (Dewmar) Dewmar was incorporated on August 5, 1955. It issued 10 shares of no-par common stock, 8 of which were issued to Dorothy E. Cook, Cook's wife, and 2 of which were issued to Cook. The original capitalization of Dewmar was $1,000; its present capitalization is $50,000. Dewmar was organized as a "construction" company and its activities were similar to those of Sierra and Woodcroft. Later, Caldwell had similar ideas about providing his wife with her own property which would be separate from his holdings, and he caused to be formed for this purpose: Lumar Homes, *122 Inc. (Lumar) Lumar was organized on July 8, 1959, with 8 shares of its no-par common stock being issued to Lula M. Caldwell, Caldwell's wife, and 2 shares being issued to Caldwell, these being the only shares of its stock issued. It was originally capitalized at $1,000; its present capitalization is $25,000. It was organized to be a "construction" company and its activities have been similar to those of Dewmar. In about 1960, Cook and Caldwell decided to enter into the business of building and selling homes on property located in the area of Pittsford, N. Y. Neither they nor their corporations had operated in this area, having operated principally in the town of Greece, N. Y. There were marked differences in home building in the two areas, which were about 15 miles apart in the Rochester metropolitan area. Because of zoning, houses had to be built on larger and more expensive lots in Pittsford. The minimum area of a house in Pittsford was 1,200 square feet; in the town of Greece, it was 1,000 square feet. The average cost of a lot in the town of Greece was about $3,500 while, in Pittsford, it was about $4,600-$4,700. The average difference in costs of a completed house in Pittsford *123 and in the town of Greece was about $7,000. Neither Cook nor Caldwell was familiar with operating a construction business in Pittsford, and they looked upon it as entailing new risks other than those with which they were acquainted in the town of Greece. Purportedly, they did not want to risk the assets of their existing corporations in the venture, and in order to so limit the liability of the business conducted in Pittsford, the following corporations were formed: Powder Mill Homes, Inc. Caldwell organized Powder Mill Homes, Inc. (hereafter referred to as Powder Mill), on April 12, 1960, to operate in Pittsford. All of the issued and outstanding stock of the corporation - 50 shares of no-par common stock - were issued to Caldwell. Original capitalization was $5,000; present capitalization is $5,000. Mendon Homes, Inc. Cook organized Mendon Homes, Inc. (hereafter referred to as Mendon), on November 21, 1960. All of the issued and outstanding stock - 45 shares of no-par common - was issued to Cook. Original capitalization was $4,500; present capitalization is the same. These two corporations were utilized by Cook and Caldwell to conduct the business of building and selling houses *124 in the Pittsford area. From 1954 until about 1956 or 1957 Caldwell & Cook, Inc., purchased raw land and developed it, and also conducted most of the administrative and selling functions for the various organizations on a fee basis. In 1956 or 1957 the partnership took over from Caldwell & Cook, Inc., the activities of developing land, and the administrative and selling functions. Thereafter the activities of Caldwell & Cook, Inc., were limited to buying lots and contracting to have houses built thereon for sale. It also owned some heavy construction equipment which it leased to others. After 1956 or 1957 the partnership was actively engaged in the development of raw land, and also performed the administration, bookkeeping, and selling functions for all of the corporations on a management fee basis. In 1961, Cook and Caldwell again decided that they should limit their liability with respect to the land development activities then being conducted by their partnership, so they organized Landorama, Inc., to take over these activities. Landorama, Inc., was organized on January 30, 1961, and 30 shares of its no-par common stock were issued to each of Cook and Caldwell, this being all of *125 its issued and outstanding stock. Its original capitalization was $6,000, and its present capitalization is the same. Since its formation Landorama, Inc., has been engaged in the business of buying and developing raw land, i.e., subdividing the land, grading it, and installing sewers, roads, sidewalks, and curbing, and selling the lots to other corporations to construct houses thereon for sale. Since the formation of Landorama, Inc., the activities of the partnership have consisted of performing the administrative and bookkeeping functions for all of the corporations, and advertising and selling the houses built by the other corporations, all for a management fee and a selling commission comparable to that charged by other businesses performing similar services for others in the Rochester area. The partnership also performed these functions throughout all the years here involved. More generally, after the partnership took over the development and administrative activities of Caldwell & Cook, Inc., in 1956 and 1957, and until Landorama, Inc., took over the land development activities in 1961, which period covers the earlier years here involved, the partnership acquired raw land, subdivided *126 it, improved it, and then sold lots to the "owning" corporations. The individuals Cook and Caldwell decided which building lots would be purchased by the various corporations. Each corporation purchased lots in its own name, generally prior to construction, but on occasion construction would begin after a corporation had contracted to buy a particular lot but prior to delivery of the deed to the corporation. The "owning" corporations then entered into contracts with one of the "construction" corporations to build houses on the lots. [6]Monroe contracted to supply the skilled labor for the "construction" companies, but some of the construction work was subcontracted or was performed by labor acquired elsewhere. When the houses were completed and ready for sale, they were sold by the partnership, acting as sales agent for the corporation that owned the property, and the partnership was paid a standard selling commission. The planning and development of subdivisions entailed contracting *127 with engineers and architects and installing sewers, pavements, etc., all of which was paid for by the partnership (or after 1960 by Landorama, Inc.). The price charged the "owning" corporation by the partnership for the lots was based on a proportionate cost of the land (which on some occasions was apparently a standard amount regardless of the size of the lot), plus a proportionate part of the estimated cost of the development improvements, plus a profit for the partnership. [7]
The contracts entered into between the "owning" corporations and the "construction" corporations provided that the "construction" corporations, as independent contractors, were to furnish all material, equipment, and labor necessary for the construction of houses in accordance with the plans and specifications. The "construction" corporations were to be paid their construction costs, plus a percentage of cost (3.3 percent in the one contract available) for overhead, plus a construction fee ranging from $450- $550 depending *128 on the model of house which was built, plus a fee for incidentals, such as $50 for a garage, or $20 for a breezeway. Monroe furnished the labor to the "construction" corporations and did no work for unrelated companies. However, Monroe did not furnish all the labor for the Cook and Caldwell corporations, and there was often advertising for bids to perform certain functions such as excavating, painting, roofing, etc. Monroe's compensation consisted of its costs for the labor supplied, plus a percentage of cost ranging from 22 percent up. Monroe owned some equipment such as trucks and miscellaneous tools. Different "owning" and/or "construction" corporations at times built houses on adjoining lots and where feasible the labor supplied by Monroe moved from one house to the next house. However, each corporation paid for the labor used in constructing its own houses. Each "owning" corporation paid for its lots and the contract cost of construction of the houses thereon, and received title to the lots in their own names and gave general warranty deeds to the purchasers of the properties when they were sold. The "owning" corporations had no employees, except their officers, and they usually *129 realized a profit out of the sale of the improved property. The partnership maintained an office and place of business where the clerical, administrative, and selling functions for all of the Cook and Caldwell corporations were performed by employees of the partnership. At this central office there was a telephone listed in the name of Caldwell & Cook. None of the Cook and Caldwell corporations had separate offices or telephone listings. Purchase orders for the "construction" corporations were usually made up by employees of the partnership, but were made in the name of the corporation for which the purchase was made. Occasionally there was an opportunity for saving by buying in large quantities and joint purchases were made for several corporations, but each corporation always paid for its own purchases. Each corporation paid the partnership a management fee for the services rendered at the central office. The partnership also performed all promotional, advertising, and selling functions for the Cook and Caldwell corporations during this period, and this was done in the name of Caldwell & Cook. The salesmen were paid by the partnership. They usually knew which corporation was the *130 actual owner of the lot involved and filled that name in on the purchase contract; however at times the name of the selling corporation was filled in by Cook or Caldwell when the contract was accepted by them. Customers buying houses usually thought they were buying a "Caldwell & Cook" house and often had never heard of the "owning" corporation. The "owning" corporation paid the partnership a real estate commission upon each sale equal to that established by the local board of realtors. Each corporation had maintained for it its own books and records which were audited separately by auditors who prepared separate financial statements for each of them. Each corporation had its own stock certificate book, its own corporate minute book, paid its own expenses from its separate bank account, entered into contracts in its own name, filed its own tax returns, and delivered deeds in which it was named grantor and warranted the title to purchasers of its completed houses. The Cook and Caldwell corporations occasionally borrowed funds from each other, and a particular corporation might borrow from another corporation which was indebted to it. Caldwell & Cook, Inc., owed the following amounts, *131 evidenced by notes, to the following petitioners and the partnership at the end-of-year dates as indicated: Creditor
Dec. 31 -
Amount
Caldwell & Cook (part-
nership)
1952
$ 23,000.00
1953
23,000.00
1954
65,320.64
1955
94,720.64
1956
106,000.00
1958
35,500.00
Monroe
1956
10,000.00
1957
26,300.00
1958
48,000.00
1959
37,500.00
1960
70,000.00
1961
20,000.00
Velmar
1957
$ 11,000.00
1959
15,000.00
1960
47,000.00
1961
8,000.00
Woodcroft
1955
43,500.00
1956
3,000.00
1957
4,550.00
1959
53,000.00
1961
50,000.00
Dewmar
1958
3,000.00
1959
81,000.00
Sierra
1958
35,000.00
1959
48,000.00
Dorba
1957
30,000.00
The amounts of gross sales, gross profit from sales, management fees paid the partnership, officers' salaries, taxable income, and net worth of each petitioner, according to their returns, for the taxable periods indicated are as follows: Gross
Manage-
Taxable
Profit
ment
Year
Gross
from
Fee
Petitioner
Ending
Sales [1] *133 Sales [1]
Paid
Dec. 31,
Caldwell & Cook, Inc.
1953
$ 849,133
$142,701
1954
1,062,857
188,211
1955
2,119,038
268,162
1956
1,331,110
154,104
$ 5,280 [2]
1957
514,697
89,992
6,748 [3]
1958
940,049
134,168
12,049
1959
899,453
95,257
7,264
1960
927,121
79,953
5,927
1961
621,987
99,824
4,322
May 31,
Woodcroft
1955
378,887
20,635
1,620
1956
522,829
34,778
2,580
1957
559,819
23,552
5,843
1958
387,283
64,188
4,062
1959
470,799
69,883
3,898
1960
302,670
47,138
2,983
1961
347,080
62,082
3,051
1962
337,073
59,625
3,670
Dec. 31,
Velmar
1956
342,718
46,176
5,280
1957
376,846
59,611
5,024
1958
367,720
65,282
3,383
1959
394,009
55,594
2,477
1960
315,127
47,432
2,205
1961
356,819
69,055
2,950
June 30,
Monroe
1955
232,919
29,785
3,315
1956
315,077
32,437
3,900
1957
266,640
25,306
4,550
1958
212,295
23,261
5,040
1959
469,264
45,449
5,040
1960
503,558
50,676
5,040
1961
667,276
80,221
13,160
1962
734,168
124,400
29,400
Jan. 31,
Dorba
1957
413,142
48,323
4,400
1958
170,852
19,723
600
1959
360,508
50,638
2,959
1960
444,501
65,648
3,084
1961
331,334
46,526
2,018
1962
310,107
56,157
3,235
Jan. 31,
Sierra
1955
$ 386,485
$ 26,263
$ 2,538
1956
593,218
32,208
1,785
1957
124,810
4,940
3,850
1958
132,936
9,668
2,368
1959 [4]
645
1960
302,215
45,008
2,534
1961
313,703
38,273
1,923
1962
234,881
45,465
3,235
Mar. 31,
Powder Mill
1961 [5]
539,461
55,425
4,164
1962
358,443
49,996
3,570
May 31,
Mendon
1961 [6]
280,068
50,602
1,710
Nov. 30,
Landorama
1961 [7]
380,220
42,506
3,960
Apr. 30,
Dewmar
1956
350,045
15,472
1,470
1957
497,764
23,131
3,365
1958
[8]
1959
406,946
75,520
3,313
1960
324,974
49,700
3,143
1961
330,168
41,278
2,615
1962
338,021
59,577
3,620
June 30,
Lumar
1960
231,758
37,359
2,085
1961
363,788
64,866
3,605
1962
299,863
48,798
3,720
*132 Officers' Salaries
Tax-
Net
able
Worth at
Petitioner
Cook
Caldwell
Income
Year-end
Caldwell & Cook, Inc.
$20,000
$20,000
$10,261
$ 27,182
32,500
32,500
28,507
45,143
35,000
35,000
29,303
61,772
12,087
12,087
13,689
71,275
10,000
0
3,803
71,824
25,000
10,000
24,349
89,519
0
0
22,983
105,867
0
0
4,849
108,052
15,000
0
34,577
130,045
Woodcroft
5,000
22,736
16,915
12,000
26,275
35,027
3,150
12,287
43,628
15,000
24,996
61,126
5,000
25,469
78,851
2,000
20,185
92,980
5,200
24,852
110,377
9,000
34,262
132,323
Velmar
0
23,453
17,417
10,000
20,136
31,512
10,500
25,161
49,090
8,000
24,854
66,488
12,500
20,368
80,746
15,000
37,093
104,050
Monroe
0
0
18,038
16,627
0
0
17,722
29,032
0
0
10,267
36,219
0
0
10,060
43,261
0
0
21,548
59,345
0
0
24,106
75,219
0
0
17,400
87,399
0
0
200
87,539
Dorba
5,000
24,527
18,169
5,000
8,079
23,824
6,000
24,798
41,183
10,000
30,999
61,562
7,200
24,426
78,661
0
38,700
102,736
Sierra
$ 5,000
$25,107
$ 18,552
12,000
27,135
37,076
0
31
36,667
0
5,904
41,230
1,375
3
41,228
1,375
26,139
59,274
4,800
17,691
71,658
0
29,227
91,186
Powder Mill
0
22,613
20,829
0
28,540
40,028
Mendon
0
30,561
24,669
Landorama
0
0
27,297
24,602
Dewmar
0
22,561
16,793
3,150
15,331
27,524
350
38
27,486
12,000
27,753
46,307
0
22,379
61,972
4,800
18,744
75,093
0
41,201
100,370
Lumar
0
17,798
13,459
0
29,053
32,904
0
27,669
51,685
With respect to Caldwell & Cook, Inc., respondent determined, under the provisions of section 61 and of section 482, [8] that the taxable income reported by each of the other corporations is to be attributed to Caldwell & Cook, Inc. In computing the amount of taxable income to be attributed to Caldwell & Cook, Inc., which filed returns on a calendar year basis, respondent determined *134 that the amount of taxable income of another corporate petitioner which filed on a fiscal year basis was to be converted to a calendar year basis. For example, petitioner Monroe filed returns on a fiscal year basis ending June 30. It reported taxable income for the fiscal year ended June 30, 1959, in the amount of $21,548.20. Six months of its taxable year were included in the calendar year of Caldwell & Cook, Inc., ending December 31, 1958. Since one-half of the taxable year of Monroe fell within the calendar year 1958, respondent determined that one-half of the taxable income for Monroe's fiscal year ended June 30, 1959, or $10,774.10, is to be included in the income of Caldwell & Cook, Inc., for the calendar year 1958. This procedure has been followed in converting to a calendar year basis the taxable income of each of the petitioners other than Caldwell & Cook, Inc., and other than Velmar, which reported, as did Caldwell & Cook, Inc., on a calendar year basis. With respect to the other petitioners, respondent has determined, under the provisions of section 269, that the corporate surtax exemption for each of the taxable years in dispute is to be disallowed. Respondent states on *135 brief that his determinations are in the alternative; that if the Court should find fully for the respondent in the case of Caldwell & Cook, Inc., docket No. 993-65, then it should find for the other 10 petitioners; and that if the Court should find for respondent in the cases of the other 10 petitioners, it should find for the petitioner Caldwell & Cook, Inc., in docket No. 993-65. Ultimate Findings of Fact Prior to the expiration of the 3-year period, beginning with the date of filing (or the due date) of each of petitioners' income tax returns, each petitioner executed, with respondent's delegate, an agreement, Form 872, providing for an extension of the statutory period for the assessment of a deficiency determined for each taxable period in dispute. Petitioners and respondent's delegate executed successive agreements, each prior to the expiration of the periods agreed upon in the next preceding agreement. The statutory notices of deficiencies were issued to petitioners prior to the expiration of the period agreed upon in the last agreements. The assessment and collection of deficiencies determined with respect to the petitioners' taxable periods in dispute are not barred by *136 the statute of limitations. Petitioners Woodcroft, Sierra, Dorba, Dewmar, Monroe, Velmar, Lumar, Powder Mill, Mendon, and Landorama, Inc., were not sham corporations during the taxable periods under review, and the income reported by them is not to be attributed to petitioner Caldwell & Cook, Inc., under the provisions of section 61. Respondent's determination that the entire taxable income of petitioners Woodcroft, Sierra, Dorba, Dewmar, Monroe, Velmar, Lumar, Powder Mill, Mendon, and Landorama, Inc., is to be allocated to petitioner Caldwell & Cook, Inc., for its taxable years 1958, 1959, 1960, and 1961 is not required in order to prevent evasion of taxes or clearly to reflect the income of petitioners and is arbitrary and unreasonable. Upon the incorporation of Woodcroft by Caldwell, and of Sierra by Cook, and of Monroe by both Cook and Caldwell, the individuals acquired control of the corporations, and the principal purpose of the acquisition was not to secure the benefit of corporate surtax exemptions which they would not enjoy but for the acquisition. For the taxable periods under review the corporate surtax exemptions are allowable to petitioners Woodcroft, Sierra, and Monroe. *137 Upon the incorporation of Velmar, Powder Mill, and Lumar, Caldwell or Caldwell and his wife acquired control of those corporations, and upon the incorporation of Dorba, Mendon, and Dewmar, Cook or Cook and his wife acquired control of those corporations, and the principal purpose of the acquisition of control of all of those corporations was to obtain the benefit of corporate surtax exemptions which the Caldwells and the Cooks would not have enjoyed but for those acquisitions, and respondent properly disallowed the corporate surtax exemptions to each of those corporations for each of its taxable years here involved. Upon the incorporation of Landorama, Inc., Cook and Caldwell acquired control of that corporation and the principal purpose of the acquisition of control of that corporation was to obtain the benefit of a surtax exemption which they would not have enjoyed but for the acquisition, and respondent properly disallowed the corporate surtax exemption to Landorama, Inc., for its taxable year here involved. Opinion Relying on the pervasive coverage of section 61[9] and the broad grant of authority given him by section 482, [10] respondent has determined that the taxable income of *138 Monroe, Sierra, Woodcroft, Velmar, Dorba, Dewmar, Lumar, Powder Mill, Mendon, and Landorama, Inc., is to be attributed to Caldwell & Cook, Inc., for its taxable years, 1958, 1959, 1960, and 1961. Respondent contends that the corporate petitioners, with the exception of Caldwell & Cook, Inc., were shams serving only as shells "bleeding off income" *139 actually earned by Caldwell & Cook, Inc., and that, even if petitioners were not shams, respondent was fully justified in allocating their taxable income to Caldwell & Cook, Inc., under the provisions of section 482. Petitioners argue that the Cook and Caldwell corporations were intended to, and actually did, serve business purposes and were engaged in earning and producing taxable income which each reported; that Caldwell & Cook, Inc., did not produce the taxable income reported by the other petitioners, and that petitioners are viable entities, having substance and the ability to carry on business in accordance with the shareholders' aims which reflected "legitimate" as opposed to mere "tax-savings" purposes. [11] *140 *141 In conflict with his determination as regards Caldwell & Cook, Inc., that the total taxable income of the other petitioners is ascribable to it, respondent has determined with respect to the other petitioners that the taxable income reported by them is properly chargeable to them but that the corporate surtax exemption is to be disallowed to them. Respondent's determinations, with respect to petitioners other than Caldwell & Cook, Inc., are grounded on section 269. [12] *142 The initial question of whether each of petitioner corporations with the exception of Caldwell & Cook, Inc., was a sham is essentially a factual issue to be resolved on the basis of facts adduced in each case. Shaw Construction Company v. Commissioner, 323 F. 2d 316, 321 (C.A. 9, 1963), affirming 35 T.C. 1102 (1961). We said in Aldon Homes, Inc., 33 T.C. 582, 596-597 (1959): a taxpayer may adopt any form he desires for the conduct of his business and that form cannot be ignored merely because it results in a tax saving. However, to be afforded recognition the form the taxpayer chooses must be a viable business entity, that is, it must have been formed for a substantial business purpose or actually engage in substantive business activity. Moline Properties, Inc. v. Commissioner, 319 U.S. 436; Jackson v. Commissioner, (C.A. 2, 1956) 233 F. 2d 289. Escaping taxation is not a substantive business activity. National Carbide Corp. v. Commissioner, 336 U.S. 422, *143 footnote 20, citing National Investors Corp. v. Hoey, * * * [144 F. 2d 466 (C.A. 2, 1944)].[13] *144 The tax saving of employing, at least in form, multiple corporations to which income actually earned by a single corporation can be deflected by "channelling transactions"; see Brentwood Homes, Inc. v. United States, 240 F. Supp. 378 (E.D.N.C.), affirmed sub nom. J. R. Land Company v. United States, 361 F. 2d 607 (C.A. 4, 1966); is especially appealing to those persons who can control the diversion of income from the entity which actually earns it to another entity or entities which they also own and control. When, as in the present case, it has been determined by respondent that multiple corporations are no more than shams, close scrutiny of their formation and activities is required. Therefore, on the one hand we are obliged to recognize the right to conduct business in corporate form, so long as it is in fact conducted by the corporation, Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943); and on the other, we must recognize that the use of multiple corporations may be no more than the means of artificially shifting income among related corporations for tax benefits. We conclude that petitioners Monroe, Sierra, Woodcroft, Dorba, Dewmar, Lumar, Velmar, Powder Mill, Mendon, and Landorama were not shams or mere paper corporations. During the periods under review, they conducted business and were active corporations. Respondent's argument that they did not engage in business since they did not have employees or own equipment is premised on a fallacious notion of what their business was. The corporations actually bought lots from Caldwell & Cook and later from Landorama, Inc., and, in fact, subcontracted with Monroe and other unrelated subcontractors for the construction of houses. This was their function in the Cook and Caldwell organization, and since it constituted a business, we cannot *145 disregard them for tax purposes. Moline Properties, Inc. v. Commissioner, supra.They reported substantial amounts of income, which were not geared to a maximum of $25,000; cf. Brentwood Homes, Inc. v. United States, supra; and they built up substantial amounts of net worth. Their existences were not limited to a short life terminated upon reporting $25,000 of taxable income, or upon selling all houses in a single subdivision. Cf. Aldon Homes, Inc., supra. The mere opportunity for the individuals Cook and Caldwell to designate which petitioner might earn income "does not constitute such control over the income that it should be imputed to" Caldwell & Cook, Inc., and the "designation does not constitute the anticipatory assignment of income" in derogation of the principal of section 61 that income is chargeable to the taxpayer which actually earns and controls it. Nat Harrison Associates, Inc., 42 T.C. 601, 620 (1964). Respondent argues that the instant issue is governed by Shaw Construction Company v. Commissioner, supra, and by Aldon Homes, Inc., supra. In those cases, for reasons set forth in the opinions, it was held that multiple corporations, formed with nominal capital, *146 with no real functions, and with the intention that they exist for only a short time, were shams. These cases are readily distinguishable from the present case in which petitioners continued in existence for an extended period, performed active functions, amassed considerable net worths, paid their own bills from their own bank accounts, earned considerable net incomes, and did their own subcontracting. Petitioners' separate existences cannot be ignored. See Bush Hog Manufacturing Co., 42 T.C. 713 (1964); South Texas Rice Warehouse Co., 43 T.C. 540 (1965), affd. 366 F. 2d 890 (C.A. 5, 1965); and Nat Harrison Associates, Inc., supra. By recognizing that Caldwell & Cook, Inc., was a validly subsisting corporation during its taxable years 1958, 1959, 1960, and 1961, respondent in effect admits that the activities conducted by petitioners amounted to the conduct of business, since Caldwell & Cook, Inc., for the periods in controversy, performed no more functions than did the other petitioners. A more difficult question is posed by the issue of whether section 482 operates to justify respondent's allocation to Caldwell & Cook, Inc., of the entire income of the other petitioners. Section 482 *147 authorizes respondent to allocate income, deductions, and credits, among commonly controlled organizations if he determines that such is necessary in order to prevent the evasion of Federal income tax or clearly to reflect the income of the organizations. We have said that respondent's discretion is extensive under section 482, and that his determinations under that provision will be overturned only where the taxpayer proves that they are arbitrary, capricious, or unreasonable. Hamburgers York Road, Inc., 41 T.C. 821 (1964). Of course, respondent's determinations under section 482 are, as are any determinations, fully subject to review by this Court. The facts with respect to this issue are relevant to the issue of whether petitioners, other than Caldwell & Cook, Inc., are to be denied the corporate surtax exemptions under section 269, since the facts concerning the actual operation of the corporations reflect on the true purpose for their organization. In our findings of fact we have reviewed not only the facts relative to the formation of the various petitioners but also, for periods prior to those in controversy, the details of the business which Cook and Caldwell conducted, *148 and we see no need to repeat them here. As of the beginning of the period here involved, about the middle of the year 1957, we find the partnership engaged in the business of subdividing and developing tracts of land for residential home building, and also conducting the administrative and selling activities for all the corporations. Monroe was engaged in the business of supplying skilled labor on contract for the various corporations. The "owning" and "construction" corporations, which included Caldwell & Cook, Inc., Woodcroft, Sierra, Velmar, Dorba, and Dewmar, were all buying lots from the partnership, either building or having houses built thereon, and having the houses and lots sold by the partnership on a commission basis. All of the above corporations continued the same activities throughout the years involved. In 1959 Lumar was formed and engaged in the same activities as the last-mentioned corporations. In 1960 Mendon and Powder Mill were formed and engaged in those same activities in the Pittsford, N. Y., area. In 1961 Landorama was formed and took over from the partnership the activity of subdividing and developing tracts of land and selling the lots to the other corporations. *149 The partnership continued to perform the administrative and selling functions for all of the petitioner corporations. For the partnership's services in selling houses, each petitioner paid the partnership an established realtor's fee of 5 percent of the selling price. [14] As compensation to it for maintaining an office and ordering materials and for performing administrative functions, petitioners paid the partnership "management fees" as set out in our findings. Under section 482, respondent can "distribute, apportion, or allocate" gross income and deductions among organizations only if they are "owned or controlled directly or indirectly by the same interests." (Emphasis added.) It is to be noted that the *150 statute does not provide that the control must be exercised by the same person or owner but only by the same interests. Thus, control may exist when members of the same family, see South Texas Rice Warehouse Co., supra, or members of a management group, see Aldon Homes, Inc., supra, as a practical matter direct the entities, although the proportionate interests of members of the group may not be the same in all the organizations. Section 1.482-1(a)(3), Income Tax Regs., provides that "It is the reality of the control which is decisive, not its form or the mode of its exercise," and we have referred to this provision with approval in South Texas Rice Warehouse Co., supra. Petitioners maintain that they are not commonly controlled within the meaning of section 482 in that, while Cook and Caldwell each owned all of the stock of Monroe and of Caldwell & Cook, Inc., and, later, of Landorama, Inc., Caldwell owned all of the stock of Woodcroft, Velmar, and Powder Mill; Cook all of the stock of Dorba, Sierra, and Mendon; Caldwell's wife 80 percent of the stock of Lumar; and Cook's wife 80 percent of the stock of Dewmar. They contend that Caldwell could have nothing to do with Cook's solely *151 owned corporations or with Dewmar, and that Cook could have no hand in the control of Caldwell's corporations or with Lumar. We are doubtful of this conclusion, and it is probable that the two individuals, by setting off lots which their corporations would buy from their partnership for building and by determining the price at which the lots would be sold, the loans which the corporations would make to each other, and the management fees payable to the partnership by the corporations together, controlled petitioners in a more or less joint manner. At any rate, for present purposes, we shall assume that petitioners were commonly controlled. [15] *152 In commenting upon the provisions for a corporate surtax exemption of $25,000, for which provision was made in the Revenue Act of 1950, the Finance Committee of the Senate reported as follows (S. Rept. No. 2375, 81st Cong., 2d Sess., 1950-2, C.B. 483 at 533, 534): The normal tax rate is made applicable to the entire normal tax net income of all corporations; the surtax rate applies to the corporation surtax net income in excess of $25,000. * * * It is not intended, however, that the exemption of the first $25,000 of a corporation's surtax net income from the surtax shall be abused by the splitting up, directly or indirectly, of a business enterprise into two or more corporations or the forming of two or more corporations to carry on an integrated business enterprise. It is believed that sections 45 ( section 482, I.R.C. 1954) and 129 ( section 269, I.R.C. 1954) will prevent this form of tax avoidance. (Emphasis added.) It appears that the partnership Caldwell & Cook, prior to 1952, and Caldwell & Cook, Inc., for a period of about 2 years thereafter, conducted "an integrated business *153 enterprise," in that one organization, bought land, prepared sites for building, [16] acted as general contractor, employed workmen directly, advertised, and sold completed homes. The method of operation, with the formation of Sierra, Woodcroft, and Monroe in mid-1954, was altered, and the single integrated business enterprise was fragmentized with the formation of petitioners to conduct separate functions in the homebuilding process. Upon superficial view, the report of the Finance Committee from which we have quoted would evidence a congressional intention that the fragmentization of integrated enterprise, with the formation of additional corporations, would automatically lead under section 482, to the allocation of net income of the newly formed corporations to the organization which had conducted the integrated enterprise, or to the disallowance of the surtax exemption to the new corporations under section 269. However, it is indicated in the report that Congress did not intend such an automatic result, since *154 there is reliance upon two existing sections of the Code, neither of which authorizes a particular result without a review of the facts of each individual case. If Congress had intended that the formation of corporations in the process of fragmentizing a single integrated enterprise would in every case lead to disallowance of the surtax exemption or to allocation of the single exemption among commonly controlled corporations, without reference to provisions which have no automatic result but which depend upon a finding of an intention to avoid income tax, there would have been enacted a specific legislative provision, as in section 1561, effective for taxable years subsequent to those here involved. [17] *155 Cf. Moke Epstein, Inc., 29 T.C. 1005, 1011 (1958). [18] But the report does make clear a congressional understanding that sections 482 and 269 will be fully utilized to deal with multiple corporations formed for tax avoidance purposes, and we approach the present issue with *156 that understanding in mind. There are some indications in the record that would lead to the suspicion that income and deductions of petitioners could have been arbitrarily shifted. [19] However, respondent's determination is that the entire taxable income of the Cook and Caldwell corporations is to be allocated to Caldwell & Cook, Inc., and respondent has made no determination with respect to the other petitioners, except to disallow the surtax exemption under section 269, nor to transactions between other petitioners. Cf. Columbian Rope Co., 42 T.C. 800 (1964). For example, respondent has not disallowed any deductions, such as officers' salaries, and has made no allocations of income and deductions of petitioners based upon a finding that management fees or purchase prices of lots were arbitrarily fixed or shifted. Respondent does not point to a single transaction between Caldwell & Cook, Inc., on the one hand, and the other petitioners, on the other hand, during the period 1958-1961 which suggests that a reallocation of specific income or deductions arising out of the transaction would more correctly reflect income or prevent tax avoidance from the transaction.[20] Cf. South Texas Rice Warehouse Co., supra. *157 Furthermore, section 482 does not permit the Commissioner to allocate net income between commonly controlled corporations simply because he finds that the common owners have the power to shift income - it must be based on a determination that there was an actual shifting of income and deductions. Bush Hog Manufacturing Co., supra. Respondent argues that the other corporations were financially dependent upon Caldwell & Cook., Inc., and could not have operated without substantial advances from that corporation. However, during the period 1958-1961, Caldwell & Cook, Inc., borrowed heavily from the partnership *158 and from other petitioners. It is true that Caldwell & Cook, Inc., during the period 1952-1954 conducted an integrated business enterprise, and that for the period 1954-1957, it owned sites and contracted with other petitioners for construction. There were therefore transactions between Caldwell & Cook, Inc., and the other petitioners that could give rise to the arbitrary shifting of income and deductions which could call into play the corrective operation of section 482. But the evidence is convincing that, during the period 1958-1961, Caldwell & Cook, Inc., operated exactly as did the other petitioners - it engaged in the general contracting business, buying lots from the partnership, and depended upon the partnership for the operation of an office and for selling completed homes, and upon Monroe for subcontracted labor. There is no evidence that there was an actual shifting of income between Caldwell & Cook, Inc., and the other corporations. Respondent adduced evidence that purchasers of homes considered that they were dealing with Caldwell & Cook and, in negotiations, had never heard of petitioners until they saw a purchase offer or their deeds in the names of petitioners. They *159 were interested only in buying a "Caldwell & Cook" home - which proves only that petitioners employed a common trade name. The buyers did not think that they were dealing with the corporation Caldwell & Cook, Inc., and there was no office listing or telephone in the name of the corporation. We conclude that respondent acted arbitrarily and unreasonably in allocating the entire taxable income of the other petitioners to Caldwell & Cook, Inc., for the taxable years 1958, 1959, 1960, and 1961. [21] There remains for decision the issue raised by respondent's alternative determinations that the surtax exemptions are to be disallowed petitioners other than Caldwell & Cook, Inc., under section 269, which provides that, if persons acquire control *160 of a corporation, and the principal purpose of the acquisition is avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which the acquirer would not enjoy but for the acquisition, then such deduction, credit, or other allowance shall not be allowed. Clearly, the corporate surtax exemption is a "credit or other allowance" which may be disallowed under section 269; sec. 1.11-1(d), Income Tax Regs.; "acquisition" for purposes of that section includes the acquisition of control upon the formation of a new corporation; James Realty Company v. United States, 280 F. 2d 394 (C.A. 8, 1960); Joe (Joseph) Dillier, 41 T.C. 762 (1964), affirmed per curiam sub nom. Made Rite Investment Co. v. Commissioner, 357 F. 2d 647 (C.A. 9, 1966); Kessmar Construction Co., 39 T.C. 778 (1963), affd. 336 F. 2d 865 (C.A. 9, 1964); and the operation of section 269 extends to the disallowance of the exemption to the acquired corporation; Concord Supply Corporation, 37 T.C. 919 (1962). It is not disputed that the individuals, Cook, Caldwell, and, in the case of Dewmar and Lumar, their wives, acquired control of their newly formed corporations. Therefore, the issue *161 is whether the principal purpose of the individuals in organizing each of their corporations was to avoid income tax by securing the benefit of the surtax exemptions which they would not have enjoyed but for the acquisition of control of their corporations. This is a question of fact, Frank Spingolo Warehouse Co., 37 T.C. 1 (1961), to be determined on the basis of the acquirers' purposes at the time of incorporation of the controlled corporations. See Bush Hog Manufacturing Co., supra. Petitioners have presented evidence - the testimony of Cook and of Caldwell - tending to show various purported purposes in forming petitioners. We say "purported" because we are not convinced that all of the purposes existed. First, with respect to Sierra, Woodcroft, and Momroe, to review some of the facts to which we have alluded, it is said that the incorporation of these corporations in mid-1954 was the result of Cook's and Caldwell's apprehension about labor strife which had troubled them in 1953. Cook and Caldwell decided that their corporation could not be picketed if it had no employees, and they decided to form a corporation which would employ all the laborers but which would be engaged in *162 strictly intrastate commerce as it would be if it only subcontracted labor. Monroe resulted. They also wanted to limit Caldwell & Cook, Inc., to owning and developing building sites. But each wanted his own corporation to act as a general contractor, and so Caldwell organized Woodcroft and Cook formed Sierra. These corporations were to contract with Caldwell & Cook, Inc., for building and were to subcontract with Monroe for labor and with outsiders for each phase of construction. We are somewhat doubtful of the correctness of the individuals' understanding of the consequences of their decisions, and it may have been worthwhile to have had the benefit of facts as to any legal advice upon which their conclusions were based. But, on balance, we conclude that the formation of Monroe, Sierra, and Woodcroft was the result of the individuals' desire to have their own corporations without the dissolution of Caldwell & Cook, Inc., and to minimize the chances of labor trouble. This was a natural division of the business under the circumstances. See Bush Hog Manufacturing Co., supra.There is ample evidence of the threat of labor trouble in 1954. But we have found unconvincing the testimony *163 of the individuals - and this is the only evidence we have - with regard to their principal purpose in forming the other petitioner corporations. The principal purpose of Caldwell in forming Velmar in 1955 and of Cook forming Dorba in 1956, both of which were so-called "owning" corporations, was supposedly to permit each man to have his own corporation to buy lots and have houses built thereon, by the "construction" companies, for sale. Had there been a purpose to hold on to the land, the purported reason for forming separate "owning" companies, as opposed to "construction" companies, might be more realistic. But these two corporations were intended to retain nothing except the profits, and these were intended to be split between two corporations. There is no apparent reason why Caldwell & Cook, Inc., could not have performed this function. Nor is there any very good reason given why Sierra and Woodcroft could not have performed this function. By 1955 and 1956 Cook and Caldwell's labor troubles were past history; and in fact they testified that in 1957 or 1958 all of the corporations except Monroe were engaged in both owning and building houses for sale. As for Dewmar, organized in *164 1955, and Lumar, organized in 1959, the ostensible purpose for their formation was to permit Caldwell and Cook to each provide a separate estate for his wife. Thus, it is said, Cook's wife acquired 80 percent of the stock of Dewmar, and Caldwell's wife acquired 80 percent of the stock of Lumar. Both Dewmar and Lumar were "construction" corporations. Neither Cook nor Caldwell explained why they did not simply give their wives shares of stock in, respectively, Sierra and Woodcroft. [22] *165 There is very little evidence on how these two corporations operated, or that their activities were any different than those of Sierra and Woodcroft, and there is no evidence that the wives took any part in the business activities of these corporations. Even assuming that, as petitioners argue, estate planning is a "legitimate" purpose under section 269, which by its terms applies only if the proscribed purpose for acquisition is avoidance of income tax, we cannot find that the principal purpose of the individuals and their wives in forming Dewmar and Lumar was other than that proscribed by section 269. Petitioners argue that because the wives of Cook and Caldwell had "control" of these two corporations, as that term is defined in section 269, and they had no interest in any of the other corporations, it cannot be said that these corporations were acquired for the purpose of securing the benefit of a credit they would not otherwise enjoy. Without deciding whether the attribution rules are applicable in determining control under section 269, we are of the opinion that both husband and wife acquired control of these corporations, that together they acquired the benefit of credits which they would not otherwise have enjoyed, and that their principal purpose in forming these corporations and acquiring control of them was to acquire those credits. [23] *166 In 1960, Cook formed Mendon and Caldwell formed Powder Mill to operate in a town across the metropolitan area from the area where their corporations had been operating. Petitioners argue that this change entailed new and unforeseeable risks and that they did not want to put the assets of their existing corporations at such risks. But the capitalization of Powder Mill was $5,000 and that of Mendon was $4,500, and it may be supposed that any construction financing would have to come from outside the organization, in which case the individuals would probably have to pledge their personal credit on behalf of their solely owned corporations, [24] or from other corporations within their organization. In fact, at December 31, 1960, Powder Mill owed Dorba $70,000 on a note, or notes. At December 31, 1961, Mendon owed Monroe $5,000. [25] Whether those obligations were subordinated to that of unsecured creditors does not appear, but there is a strong likelihood that the assets of the other corporations would be, directly or indirectly, put at the risks of the business of Powder Mill and of Mendon. Furthermore, the evidence indicates that the houses built and sold by these corporations *167 in the Pittsford area were advertised and sold as Caldwell & Cook houses and it seems highly unlikely that avoiding subjecting their other corporations to the risks of this business was the principal purpose for forming and acquiring control of these two corporations. Finally, the individuals' formation of Landorama, Inc., in January 1961, is said to be attributable to the primary purpose of the partners to have a corporation succeed to the land development business of Caldwell & Cook, the partnership. Of course, the formation of a corporation to obtain the benefit of limited liability may be a valid reason for incorporating, and respondent recognizes as much by his recognition that Caldwell & Cook, Inc., succeeded to the business of the partnership in 1952 and that the surtax exemption is not to be disallowed that corporation. But there is no evidence whatever explaining why, in early 1961, the partners did not utilize their existing corporation, Caldwell & *168 Cook, Inc., to assume the operations of the partnership as they had availed themselves of it in 1952, 1953, and 1954. We conclude that petitioners have not borne their burden of proving that the principal purpose of the individuals in forming each of petitioners Velmar, Dorba, Dewmar, Lumar, Powder Mill, Mendon, and Landorama, Inc., was not to avoid income tax by securing the benefit of surtax exemptions by acquiring control of the corporations upon incorporation. Petitioners have referred us to authorities in which certain purposes have been found to be "business" purposes as opposed to "tax avoidance" purposes. Our factual conclusions serve to distinguish them. Decisions will be entered for the petitioners in docket Nos. 974-65, 979-65, and 980-65. Decision will be entered under Rule 50 in docket No. 993-65. [26] Decisions will be entered for the respondent in docket Nos. 972-65, 973-65, 975-65, 976-65, 977-65, 978-65, and 981-65. Footnotes
*. Cases of the following petitioners are consolidated herewith: Dewmar Construction Co., Inc., docket No. 973-65; Woodcroft Construction Co., Inc., docket No. 974-65; Velmar Homes, Inc., docket No. 975-65; Powder Mill Homes, Inc., docket No. 976-65; Lumar Homes, Inc., docket No. 977-65; Landorama, Inc., docket No. 978-65; Monroe Builders' Service Co., Inc., docket No. 979-65; Sierra Construction Co., Inc., docket No. 980-65; Mendon Homes, Inc., docket No. 981-65; and Caldwell & Cook, Inc., docket No. 993-65.↩
1. Short taxable year Apr. 12, 1960 - Mar. 31, 1961. ↩
2. Short taxable year July 8, 1959 - June 30, 1960. ↩
3. Short taxable year Jan. 30, 1961 - Nov. 30, 1961. ↩
4. Short taxable year Nov. 21, 1960 - Aug. 31, 1961.↩
1. Statutory references are to the Internal Revenue Code of 1954 unless otherwise noted. ↩
2. Originally, there was the issue of whether the determinations of deficiencies were barred by the statute of limitations, but petitioners apparently abandoned it. In any event, the record contains petitioners' agreements, Form 872, extending the periods for assessment and collection of deficiencies, and, for completeness, we have reviewed the agreements and have made ultimate findings with respect to them.↩
3. The parties have stipulated that the corporation's authorized capital consisted of 200 shares of no-par common stock, all of which was issued to the partnership. The stock record book of the corporation indicates that 100 shares were issued to the partnership. In any event, the partnership owned all of the issued and outstanding stock of Caldwell & Cook, Inc.↩
4. As it turned out none of the petitioners, with the exception of Monroe Builders' Service Co., Inc., directly employed any workmen. 5. It is recited in the minutes of the meeting of directors of Caldwell & Cook, Inc., on June 1, 1954, that Cook was advised by counsel that corporations engaged in interstate commerce could not resort to State courts for antiunion injunctions.↩
6. Sometime in late 1957 or early 1958, Cook and Caldwell decided that the immediate danger of union problems was no longer present so the "construction corporations" also began buying lots and building thereon.↩
7. It is not clear from the evidence whether the profit to the partnership was covered by the management fees and selling commissions received by it or was added into the selling price of the lots.↩
1. In the case of Monroe, "Gross Sales" is described as "Gross Receipts" and "Gross Profit from Sales" as "Gross Profit." 2. Also reported was "office overhead allocation" in the amount of $2,400. ↩
3. Also reported was "office overhead allocation" in the amount of $1,575. ↩
4. For the taxable year ended Jan. 31, 1959, Sierra reported as income only minor amounts of interest and purchases discounts. ↩
5. Taxable period Apr. 12, 1960-Mar. 31, 1961. ↩
6. Taxable period Nov. 21, 1960-Aug. 31, 1961. ↩
7. Taxable period Jan. 30, 1961-Nov. 30, 1961. ↩
8. For the taxable year ended Apr. 30, 1958, Dewmar reported as income only a minor amount from interest.↩
8. In the notice of deficiency issued to Caldwell & Cook, Inc., respondent stated that the determination was also made under the provisions of section 269, but respondent on brief does not rely on section 269↩ to support the determination in the case of Caldwell & Cook, Inc.
9. SEC. 61. GROSS INCOME DEFINED. (a) General Definition. - Except as otherwise provided in this subtitle, gross income means all income from whatever source derived * * * ↩
10. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses.↩
11. In the preliminary stages of these proceedings, in their petitions and in support of a motion to require respondent to make a further and better statement of the grounds upon which he relied for defense of his determinations, petitioners alleged that respondent, in the statutory notices had used an arbitrary "shotgun" approach in relying upon secs. 61(a), 482, and 269. But, as it developed, petitioners had their own scatter gun. They alleged that respondent's determinations were "arbitrary, excessive, discriminatory and capricious" and deprived petitioner of due process in violation of the Fifth Amendment; that respondent's determinations, as regards Caldwell & Cook, Inc., on the one hand, and the other petitioners on the other hand, are inconsistent and respondent has "waived and destroyed" any presumption that his determinations are correct; that assessment and collection of some of the deficiencies is barred by the statute of limitations; and that for various other reasons respondent's determinations deprive petitioners of their constitutional rights. At the hearing, petitioners filed a carefully prepared written opening statement in which the foregoing arguments are not mentioned, and there is no reference to them in petitioners' briefs. We assume these arguments have been abandoned, although we have dealt with the statute of limitations in our findings of fact. The fact that respondent's determinations may be inconsistent with respect to the various taxpayers, clearly being in the alternative, does not make them arbitrary or unreasonable, nor does it relieve petitioners of their burden of proof. Nat Harrison Associates, Inc., 42 T.C. 601. Despite petitioners' protestations we granted respondent's motion to consolidate these cases for hearing and opinion to prevent the possibility of inconsistent results.
12. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or * * *
and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.
13. Respondent relies upon the following language from the National Investors Corp. v. Hoey, 144 F. 2d 466, 468↩: "to be a separate jural person for purposes of taxation, a corporation must engage in some industrial, commercial, or other activity besides avoiding taxation; in other words, * * * the term 'corporation' will be interpreted to mean a corporation which does some 'business' in the ordinary meaning; and * * * escaping taxation is not 'business' in the ordinary meaning."
14. These fees were deducted by petitioners as "advertising" on their returns. The confusion is probably due to the fact that petitioners paid the partnership for "advertising and merchandising," and that selling commissions of 5 percent would be embraced with the latter term. As petitioners point out on brief, the petitioners' deductions for advertising equal almost exactly 5 percent of gross sales, and the fair inference is that the amounts in fact represent selling commissions.↩
15. Petitioners do not contend that section 482 does not authorize respondent to allocate the entire taxable income of one taxpayer to another within the commonly controlled group. Cf. Aldon Homes, Inc., 33 T.C. 582, 607 (1959) (concurring opinion); Hamburgers York Road Inc., 41 T.C. 821 (1964); Nat Harrison Associates, Inc., supra at 621. Nor do they contend that their interests herein are adverse on the grounds that the amounts of taxable income of the Cook corporations, which may be attributed to Caldwell & Cook, Inc. (in which case deficiencies would be borne by Cook and Caldwell equally), are not the same as those of the Caldwell corporations.
16. It is not clear when the full-scale development of subdivisions by a Cook and Caldwell organization began, but the organizations began building in only subdivisions about 1954.↩
17. Sec. 1561, enacted in the Revenue Act of 1964, represents a congressional solution to the multiple corporation problem. In brief, it allows only one surtax exemption to a group of commonly controlled corporations. In S. Rept. No. 830, 88th Cong., 2d Sess., 1964-1 C.B. Part 2, 652, 653, it is stated with respect to the surtax exemption that it was "intended to encourage small businesses which operate in corporate form," but that large enterprises had taken advantage of the normal tax rates "by organizing their corporate structure in multiple corporate form." "As a result," states the report, "the Internal Revenue Code contains several provisions designed to prevent taxpayers from using the multiple form of corporate organization, to avoid taxes. For example, present law provides (sec. 269↩) that where an individual or corporation acquires control of a corporation and the principal purpose of the acquisition is the evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance, this deduction, credit or allowance is not to be allowed. * * *" 18. In Moke Epstein, Inc., 29 T.C. 1005, 1011↩, we said, "This Court and others have recognized in numerous cases, that segments of what might have been an integrated business may be handled by separate taxpayers; and that the income of such separate taxpayer should not be combined for income tax purposes. * * *"
19. For example, the variance in the compensation paid to Caldwell and Cook by the various corporations in different years, despite the fact that the services rendered did not change; the cost plus fixed fee plus a percentage of cost basis on which the construction corporations paid Monroe for labor; the basis for determining the amount of the management fee; concerning all of which there is little evidence. ↩
20. There is considerable confusion engendered in the record and on brief by respondent's reference to Caldwell & Cook, Inc., as simply "Caldwell & Cook," the partnership name.↩
21. Because there is no determination that income from particular transactions or projects is to be allocated to Caldwell & Cook, Inc., we have no basis for finding that some portion of the other petitioners' income is to be allocated to that corporation; cf. Nat Harrison Associates, Inc., supra, or for otherwise making our own allocation; cf. Pauline W. Ach, 42 T.C. 114 (1964), affd. 358 F. 2d 342 (C.A. 6, 1966), certiorari denied 385 U.S. 899↩.
22. We might speculate that there would be gift tax considerations involved in giving their wives stock in new corporations rather than in corporations with substantial net worth, but we cannot hold that petitioners have borne their burden of proof upon the basis of surmise.
23. Furthermore, we are not too convinced that respondent should not be upheld in allocating the entire net income of these two corporations to Caldwell & Cook, Inc., under section 482, but the result would be pretty much the same for tax purposes so we are disallowing the surtax exemptions.
24. And perhaps pledge the shares of the other corporations as collateral. ↩
25. Although it should be noted, particularly with regard to respondent's argument that Mendon was a sham, that, at Dec. 31, 1961, Lumar owed Mendon $45,000.↩
26. To reflect adjustments to amounts of charitable deductions not in dispute.↩